**No. 12-2496**

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ROBERT YATES, MJG-08-269, ALAN S. BARRY, MJG-08-269, DAVID YOUNG, MJG-08-269, CARLO HORNSBY, ED FRIEDLANDER, MJG-08-269, PAUL ENGEL, individually and on behalf of all others similarly situated, MJG-08-269, WILLIAM D. FELIX, DAVID KREMSER, on behalf of himself and on behalf of Elk Meadow Investments, LLC, CHARLES W. DAMMEYER, on behalf of himself and others similarly situated,

*Plaintiffs-Appellants,*

and

F. RICHARD MANSON, individually and on behalf of all others similarly situated MJG-08-269, GEETA SHAILAM, individually and on behalf of all others similarly situated MJG-08-386, MICHAEL J. CIRRITO, individually and on behalf of all others similarly situated MJG-08-476, JOHN J. HUFNAGLE, individually and on behalf of all others similarly situated MJG-08-579, WILLIAM JOHNSTON, derivatively on behalf of Municipal Mortgage & Equity, LLC MJG-08-670, ROBERT STAUB, derivatively on behalf of Municipal Mortgage & Equity, LLC MJG-08-802, THE MARY L. KIESER TRUST, by Mary L. Kieser and Ralph F. Kieser, Trustees, derivatively and on behalf of Nominal Defendant, Municipal Mortgage & Equity LLC MJG-08-805, JUDITH GREENBERG, JOSEPH S. GELMIS, individually and on behalf of all others similarly situated MJG-08-2133, ARNOLD J. ROSS, MJG-08-2133, TROY BROY, JULES ROTHAS, individually and on behalf of all others similarly situated MJG-08-2134, NAOMI RAPHAEL, FAFN/SLATER GROUP, KREMSER GROUP, MJG-08-269,

*Plaintiffs*

*[see inside cover pages for additional caption & counsel]*

June 28, 2013

v.

MUNICIPAL MORTGAGE & EQUITY, LLC, MELANIE M. LUNDQUIST,
MICHAEL L. FALCONE, MERRILL LYNCH PIERCE FENNER AND SMITH
INCORPORATED, RBC CAPITAL MARKETS, LLC, MARK K. JOSEPH,
CHARLES C. BAUM, EDDIE C. BROWN, ROBERT S. HILLMAN, DOUGLAS
A. MCGREGOR, ARTHUR S. MEHLMAN, FRED N. PRATT, JR., RICHARD
O. BERNDT, WILLIAM S. HARRISON, DAVID KAY, CHARLES M.
PINCKNEY,

*Defendants-Appellees,*

and

GARY A. MENTESANA, BARBARA B. LUCAS, EARL W. COLE, III,
ANGELA B. BARONE,

*Defendants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
No. 1:08-md-1961-MJG
The Honorable Marvin J. Garbis

**BRIEF FOR DEFENDANTS-APPELLEES
MUNICIPAL MORTGAGE & EQUITY, LLC, MARK K. JOSEPH,
WILLIAM S. HARRISON, CHARLES M. PINCKNEY, DAVID KAY,
CHARLES C. BAUM, RICHARD O. BERNDT, EDDIE C. BROWN,
ROBERT S. HILLMAN, DOUGLAS A. MCGREGOR, ARTHUR S.
MEHLMAN, FRED N. PRATT, JR., MICHAEL L. FALCONE, AND
MELANIE LUNDQUIST**

Mark Holland
William M. Jay
Mary K. Dulka
GOODWIN PROCTER LLP
620 Eighth Avenue
New York, NY 10018
(212) 813-8800

Anthony Candido
CLIFFORD CHANCE LLP
31 West 52nd Street
New York, NY 10019
(212) 878-8000

Stephen A. Goldberg
Ward B. Coe III
GALLAGHER EVELIUS
    & JONES LLP
218 North Charles St., Suite 400
Baltimore, MD 21201
(410) 727-7702

*Attorneys for Defendants-Appellees*
*Municipal Mortgage & Equity, LLC, Mark*
*K. Joseph, William S. Harrison, Charles M.*
*Pinckney and David Kay*

William M. Krulak, Jr.
MILES & STOCKBRIDGE P.C.
100 Light St.
Baltimore, MD 21202
(410) 727-6464

*Attorneys for Defendants-Appellees*
*Charles C. Baum, Richard O.*
*Berndt, Eddie C. Brown, Robert S.*
*Hillman, Douglas A. McGregor,*
*Arthur S. Mehlman, and Fred N.*
*Pratt, Jr.*

Charles O. Monk, II
Geoffrey M. Gamble
SAUL EWING LLP
500 E. Pratt St., Suite 900
Baltimore, MD 21202
(410) 332-8600

*Attorneys for Defendant-Appellee*
*Michael L. Falcone*

David W.T. Daniels
RICHARDS KIBBE & ORBE LLP
701 8th St., N.W.
Washington, DC 20001
(202) 261-2960

*Attorneys for Defendant-Appellee*
*Melanie Lundquist*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  12-2496    Caption:  Robert Yates, et al. v. Municipal Mortgage & Equity, LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Municipal Mortgage & Equity, LLC
(name of party/amicus)

who is _____ an appellee _____, makes the following disclosure:
      (appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☑ YES ☐ NO

2.    Does party/amicus have any parent corporations?                          ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                          ☐ YES ☑ NO
      If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☑YES ☐NO
If yes, identify entity and nature of interest:

> Municipal Mortgage & Equity LLC has purchased insurance policies underwritten by American International Specialty Lines Insurance Company, Ace American Insurance Company, and XL Specialty Insurance Company, under which Municipal Mortgage & Equity LLC may be insured against liability in the litigation.

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature:  /s/ Mark Holland                              Date:     June 28, 2013

Counsel for:  Appellees

## CERTIFICATE OF SERVICE
****************************

I certify that on _____June 28, 2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Mark Holland                                              June 28, 2013
        (signature)                                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. __12-2496__      Caption: __Robert Yates, et al. v. Municipal Mortgage & Equity, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Mark K. Joseph, William S. Harrison, Charles M. Pinckney, and David Kay__
(name of party/amicus)

_____

who is _____appellees_____, makes the following disclosure:
          (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                   ☐ YES ☑ NO
         If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                            ☐ YES ☑ NO
         If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☑YES ☐NO
If yes, identify entity and nature of interest:

Municipal Mortgage & Equity LLC has purchased insurance policies underwritten by American International Specialty Lines Insurance Company, Ace American Insurance Company, and XL Specialty Insurance Company, under which the above defendants may be insured against liability in the litigation.

5.   Is party a trade association? (amici curiae do not complete this question)   ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?   ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ Mark Holland _____     Date: _____June 28, 2013_____

Counsel for: Appellees _____

## CERTIFICATE OF SERVICE
**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

I certify that on _____June 28, 2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Mark Holland _____                _____June 28, 2013_____
        (signature)                                                          (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  12-2496          Caption:   Robert Yates, et al. v. Municipal Mortgage & Equity, LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

 Charles C. Baum, Eddie C. Brown, Robert C. Hillman, Barbara B. Lucas,
(name of party/amicus)

Douglas A. McGregor, Arthur S. Mehlman, Fred N. Pratt, Jr., and Richard O. Berndt

 who is _____ appellees _____, makes the following disclosure:
        (appellant/appellee/amicus)

1.      Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.      Does party/amicus have any parent corporations?                     ☐ YES ☑ NO
        If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                       ☐ YES ☑ NO
        If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/ William Krulak, Jr. (with permission)    Date: June 28, 2013

Counsel for: Appellees

## CERTIFICATE OF SERVICE
**************************

I certify that on _____June 28, 2013_____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Mark Holland                                June 28, 2013
     (signature)                                    (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No. __12-2496__    Caption: __Robert Yates, et al. v. Municipal Mortgage & Equity, LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Michael L. Falcone__
(name of party/amicus)

_____

who is _____an appellee_____, makes the following disclosure:
      (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.     Does party/amicus have any parent corporations?  ☐YES ☑NO
     If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
     If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct
financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☑YES ☐NO
If yes, identify entity and nature of interest:

> Municipal Mortgage & Equity LLC has purchased insurance policies underwritten by American
> International Specialty Lines Insurance Company, Ace American Insurance Company, and XL
> Specialty Insurance Company, under which the above appellee may be insured against liability
> in the litigation.

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected
substantially by the outcome of the proceeding or whose claims the trade association is
pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/Geoffrey M Gamble (with permission)    Date:    June 28, 2013

Counsel for: Michael L. Falcone

## CERTIFICATE OF SERVICE
**************************

I certify that on ____June 28, 2013____ the foregoing document was served on all parties or their
counsel of record through the CM/ECF system if they are registered users or, if they are not, by
serving a true and correct copy at the addresses listed below:

/s/ Mark Holland                                June 28, 2013
(signature)                                     (date)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case.  In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form.  Counsel has a continuing duty to update this information.

No.  12-2496     Caption:   Robert Yates, et al. v. Municipal Mortgage & Equity, LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Melanie M. Lundquist
(name of party/amicus)

_____

who is _____ an appellee _____, makes the following disclosure:
       (appellant/appellee/amicus)

1.     Is party/amicus a publicly held corporation or other publicly held entity?   ☐ YES ☑ NO

2.     Does party/amicus have any parent corporations?                              ☐ YES ☑ NO
       If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

3.     Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                              ☐ YES ☑ NO
       If yes, identify all such owners:

- 1 -

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐ YES ☑ NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐ YES ☑ NO
If yes, identify any trustee and the members of any creditors' committee:

Signature: /s/David W.T. Daniels (with permission)    Date:    June 28, 2013

Counsel for: Melanie M. Lundquist

## CERTIFICATE OF SERVICE
**************************

I certify that on ____June 28, 2013____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

/s/ Mark Holland                                    June 28, 2013
          (signature)                                          (date)

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ............................................................iv

JURISDICTIONAL STATEMENT ...................................................1

COUNTER-STATEMENT OF THE ISSUES PRESENTED ..................1

COUNTER-STATEMENT OF THE CASE ......................................2

    A.    The Proceedings Below. ..............................................2

    B.    The District Court's Decision. ......................................4

        1.    Securities Act Claims ......................................4

        2.    Exchange Act Claims ......................................5

        3.    Control-Person Claims ....................................6

        4.    Claims Still Pending ........................................6

    C.    Interlocutory Appeal ..................................................6

COUNTER-STATEMENT OF FACTS ...........................................6

    A.    MMA's Business..........................................................7

    B.    The Adoption of FIN 46R...........................................8

    C.    MMA's Secondary Public Offering In 2005. ...........11

    D.    MMA's First Restatement...........................................11

    E.    MMA's Announcement of the Second Restatement. ..............12

    F.    MMA's Continuing Disclosures. ..............................13

    G.    MMA's January 28 and 29, 2008 Disclosures..........16

SUMMARY OF ARGUMENT ...................................................17

ARGUMENT .........................................................................19

i

I.    THE DISTRICT COURT CORRECTLY DISMISSED THE
      SECURITIES ACT CLAIMS. ...............................................................19

      A.    The District Court Correctly Held That Plaintiffs' Section
            11 Claims Were Barred by the Three-Year Statute of
            Repose. .....................................................................................19

      B.    Dammeyer Has Not Pleaded Facts Supporting a Plausible
            Inference That He Has Standing. ...............................................27

      C.    Dammeyer's Claims Are Independently Untimely. ................30

II.   THE DISTRICT COURT CORRECTLY DISMISSED THE
      CLAIM UNDER EXCHANGE ACT RULE 10b-5. .........................32

      A.    The Pleading Standards for Scienter. ........................................33

      B.    Plaintiffs Failed To Plead Particularized Facts Showing
            That Defendants Acted With Scienter. .....................................34

      C.    All of Plaintiffs' Scienter Allegations Together Fail to
            Create a Cogent or Compelling Inference that Defendants
            Acted Knowingly or Recklessly. ...............................................41

            1.    Plaintiffs' Generic Allegations of Corporate Motive
                  or Knowledge Cannot Support a Strong Inference Of
                  Scienter. ..........................................................................42

            2.    Plaintiffs' Allegations of Firings and Resignations
                  Do Not Support A Strong Inference of Scienter. ..........44

            3.    Plaintiffs' Allegations of Stock Sales By Insiders
                  Are Insufficient To Demonstrate Scienter.....................46

      D.    Plaintiffs Have Failed To Adequately Allege Scienter As
            To Ms. Lundquist. .....................................................................49

      E.    Plaintiffs Have Failed To Plead Loss Causation Because
            They Blame The Stock Drop On The Disclosure Of
            Information That Was Already Public. ......................................55

III.  THE DISTRICT COURT CORRECTLY DISMISSED THE
      CONTROL-PERSON CLAIMS. .......................................................60

ii

CONCLUSION ..................................................................................................61

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp., Inc.*,
  47 F.3d 47 (2d Cir. 1995) ...................................................................49

*In re Acterna Corp. Sec. Litig.*,
  378 F. Supp. 2d 561 (D. Md. 2005) ....................................................44

*In re Adelphia Commc'n Corp. Sec. & Derivative Litig.*,
  2005 WL 1679540 (S.D.N.Y. July 18, 2005) ......................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................33

*Brockton Ret. Sys. v. Shaw Grp. Inc.*,
  540 F. Supp. 2d 464 (S.D.N.Y. 2008) .................................................45

*Caviness v. Derand Res. Corp.*,
  983 F.2d 1295 (4th Cir. 1993) .......................................................21, 26

*In re Century Aluminum Co. Sec. Litig.*,
  2013 WL 1633094 (9th Cir. Apr. 17, 2013) ........................................30

*In re Cerner Corp. Sec. Litig.*,
  425 F.3d 1079 (8th Cir. 2005) ............................................................43

*In re Constellation Energy Grp., Inc.*,
  738 F. Supp. 2d 614 (D. Md. 2010) ...............................................44, 48

*In re Countrywide Fin. Corp. Sec. Litig.*,
  2009 WL 943271 (C.D. Cal. Apr. 6, 2009) .....................................20, 24

*Cozzarelli v. Inspire Pharm. Inc.*,
  549 F.3d 618 (4th Cir. 2008) ........................................................42, 46

*In re Direxion Shares ETF Trust*,
  279 F.R.D. 221 (S.D.N.Y. 2012) .........................................................31

*Diskin v. Lomasney & Co.*,
  452 F.2d 871 (2d Cir. 1971) ...............................................................22

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ................................................................43

*Elam v. Neidorff*,
    544 F.3d 921 (8th Cir. 2008) ..............................................................44

*Fed. Hous. Fin. Auth. v. UBS Ams.*,
    2012 WL 2400263 (S.D.N.Y. June 26, 2012) ....................................23

*Finkel v. Stratton Corp.*,
    962 F.2d 169 (2d Cir. 1992) ........................................................20, 25

*In re First Union Corp. Sec. Litig.*,
    128 F. Supp. 2d 871 (W.D.N.C. 2001) ..........................................47, 49

*Footbridge Ltd. Trust v. Countrywide Fin. Corp.*,
    770 F. Supp. 2d 618 (S.D.N.Y. 2011) .................................................23

*Glaser v. The 9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................46

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) ........................................................13, 60

*GSC Partners CDO Fund v. Washington*,
    368 F.3d 228 (3d Cir. 2004) ................................................33, 34, 43

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ............................................................................27

*In re H&R Block Sec. Litig.*,
    527 F. Supp. 2d 922 (W.D. Mo. 2007) ...............................................39

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007) .................................................48

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ........................................................43, 44

*Institutional Investors Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ........................................................37, 53

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ............................................................33, 56, 59

*Lampf, Pleva, Lipkind, Prupis & Petrigrow v. Gilbertson*,
   501 U.S. 350 (1991)................................................................................31

*In re Lehman Bros. Sec. & ERISA Litig.*,
   903 F. Supp. 2d 152 (S.D.N.Y. 2012) ......................................................23

*Matrix Capital Management Fund, LP v. BearingPoint, Inc.*,
   576 F.3d 172 (4th Cir. 2009) ..............................................................34, 40

*In re Merck & Co, Inc. Sec., Derivative & ERISA Litig.*,
   543 F.3d 150 (3d Cir. 2008) ....................................................................58

*In re Metro. Sec. Litig.*,
   2010 WL 537740 (E.D. Wash. Feb. 8, 2010) ..........................................20

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................54

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010) ....................................................................56

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
   353 F.3d 338 (4th Cir. 2003) ...................................................................43

*P. Stolz Family P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004) .................................................20, 24, 25, 26

*In re PEC Solutions, Inc. Sec. Litig.*,
   418 F.3d 379 (4th Cir. 2005) .....................................................................6

*City of Philadelphia v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ...............................................................43

*Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*,
   2013 WL 3214588 (2d Cir. June 27, 2013).............................................31

*Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*,
   551 F.3d 305 (4th Cir. 2009) ...................................................................46

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ..................................................... 47, 48

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
   75 F.3d 801 (2d Cir. 1996) ...................................................... 43

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) .............................................................. 33

*Teachers' Ret. Sys. v. Hunter*,
   477 F.3d 162 (4th Cir. 2007) ..................................................*passim*

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .............................................................*passim*

*In re Vantive Corp. Sec. Litig.*,
   283 F.3d 1079 (9th Cir. 2002) ...............................................47, 48

## **Statutes**

Section 2(a)(3) of the Securites Act, 15 U.S.C. § 77b(a)(3)...................................22

Section 4(a)(3)(B) of the Securities Act, 15 U.S.C. § 77d(a)(3)(B)................24, 29

Section 5(a) of the Securities Act, 15 U.S.C. § 77e(a) ...........................................20

Section 5(b) of the Securities Act, 15 U.S.C. § 77e(b)...........................................29

Section 5(c) of the Securities Act, 15 U.S.C. § 77e(c) ...........................................25

Section 8(a) of the Securities Act, 15 U.S.C. § 77h(a)...........................................11

Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*(a)(2) ................................27

Section 13 of the Securities Act, 15 U.S.C. § 77m...........................................19, 30

Section 21D of the Exchange Act, 15 U.S.C. § 78u-4................................................5

Section 21D(b)(2) of the Echange Act, 15 U.S.C. § 78u-4(b)(2)...........................34

Section 21D(b)(4) of the Echange Act,15 U.S.C. § 78u-4(b)(4)...........................55

## Rule and Regulations

17 C.F.R. § 229.512(a)(1) (2004) ...................................................................23

17 C.F.R. § 229.512(a)(2) (2004) ...................................................................23

17 C.F.R. § 229.512(a) (2013) .......................................................................23

17 C.F.R. § 230.174 .......................................................................................29

17 C.F.R. § 230.430B(f)(2).............................................................................23

17 C.F.R. § 240.10b5-l(c)(l) ..........................................................................48

47 Fed. Reg. 11,380 .......................................................................................22

70 Fed. Reg. 44,722 .......................................................................................23

Fed. R. Civ. P. 54(b) ...................................................................................1, 6

## Other Authorities

*Restatement (Second) of Contracts* § 33 cmt. e ............................................21

Brief of the Securities and Exchange Commission, Amicus Curiae,
   Submitted at the Request of the Court, *P. Stolz Family P'ship L.P. v.
   Daum*, 355 F.3d 92 (2d Cir. 2004)..............................................................26

Samuel N. Allen, *A Lawyer's Guide to the Operation of Underwriting
   Syndicates*, 26 New Eng. L. Rev. 319, 328-30 (1991) ........................................29

Louis Loss, Joel Seligman & Troy Paredes, *Securities Regulation* (4th ed.
   2006) ...........................................................................................................25

Alan Reinstein et al., *Consolidation of Variable-Interest Entities: Applying
   the Provisions of FIN 46(R)*, 76 CPA J. 28, 30 (Aug. 2006)................................9

## JURISDICTIONAL STATEMENT

Plaintiffs correctly recite the statutory basis for jurisdiction. This appeal is from a partial final judgment pursuant to Fed. R. Civ. P. 54(b). (*See* Joint Appendix ("JA") 1738-48.)

## COUNTER-STATEMENT OF THE ISSUES PRESENTED

1. Claims under Section 11 of the Securities Act of 1933 ("Securities Act") are time-barred unless brought within "three years after the security was bona fide offered to the public." The Section 11 claim in this case alleges deficiencies in a registration statement that the SEC declared effective more than three years before any plaintiff filed suit. Is the Section 11 claim time-barred?

2. Only persons who purchased securities in the pertinent public offering have standing to sue under Section 12(a)(2) of the Securities Act. The only plaintiff asserting a Section 12(a)(2) claim failed to allege that he purchased in the offering, and his confirmation slip states that he purchased after the offering, at a different price. Does he have standing to sue under Section 12(a)(2)?

3. Claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder must allege "with particularity" facts supporting a "strong inference" that each defendant acted with scienter. Did the District Court correctly conclude that Plaintiffs had failed to carry their pleading burden?

4.      Claims under Section 10(b) and Rule 10b-5 must plead "with sufficient specificity" how the defendants' actions caused the plaintiffs' losses. The information that Plaintiffs contend caused the stock price to drop was publicly disclosed months before Plaintiffs' stock declined in value.  Did Plaintiffs fail to plead loss causation?

## COUNTER-STATEMENT OF THE CASE

### A.    The Proceedings Below.

This appeal involves the District Court's dismissal of several counts of the 196-page Consolidated Amended Complaint (the "Complaint") filed by plaintiffs Robert Yates, Alan S. Berry, David Young, Carlo Hornsby, Ed Friedlander, Paul B. Engel, William D. Felix, David A. Kremser, and Charles W. Dammeyer (collectively, the "Plaintiffs") in this consolidated multidistrict litigation.  The first member case was filed on February 1, 2008, and the Judicial Panel on Multidistrict Litigation consolidated the cases in the District of Maryland for pretrial proceedings before Judge Garbis.

Plaintiffs purport to represent a class comprising all persons who purchased or acquired the common stock of defendant Municipal Mortgage & Equity, LLC ("MMA" or the "Company") between May 3, 2004 and January 29, 2008 (the "Class Period").   (JA48-49 (Compl. ¶¶ 1-4).)   Plaintiffs assert claims under Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of

the Exchange Act. (JA87 (Compl. ¶¶ 96-97).) They have named as defendants MMA, several of its present and former officers and directors, and the two underwriters from MMA's 2005 secondary public offering of stock ("SPO"). (JA49 (Compl. ¶ 4).)

This appeal from partial final judgment concerns two sets of claims. (*See* JA1634 (chart of claims and defendants).) One set, Counts 6-8, consists of Securities Act claims asserted by plaintiff Charles Dammeyer based on alleged deficiencies in the registration statement that MMA filed in connection with its 2005 SPO. Dammeyer was not a named plaintiff in any of the consolidated actions; he appeared as a plaintiff for the first time when the consolidated Complaint was filed. Dammeyer does not allege that he purchased any shares in the SPO; rather, he contends that he acquired his shares "pursuant and/or traceable to" the prospectus used in the SPO.[1]

The second set, Counts 1-2, consists of allegations that MMA and its current and former officers violated the Exchange Act by filing materially false and misleading financial statements during the Class Period.

Both sets of allegations derive from MMA's struggle to comply with a challenging new accounting rule, Financial Accounting Standards Board Financial Interpretation No. 46R ("FIN 46R"), which was adopted shortly before the events

---

[1] JA89 (Compl. ¶ 103); *accord* JA237-39 (Compl. ¶¶ 372, 378-380).

alleged in the Complaint. FIN 46R ultimately required MMA to include on its own financial statements the earnings of hundreds of investment funds in which MMA typically held an interest of less than 1.0%. Plaintiffs allege that MMA failed to comply timely with FIN 46R,[2] and that MMA also failed to disclose that the costs of restating its financials to comply with this new accounting rule would reduce the Company's cash available to distribute to shareholders as dividends.[3]

### B.    The District Court's Decision.

Defendants moved to dismiss the Complaint. Following extensive briefing and a lengthy oral argument, the District Court issued a 100-page opinion dismissing five of Plaintiffs' eight claims.

#### 1.    Securities Act Claims

The District Court dismissed Dammeyer's three claims under the Securities Act pertaining to MMA's SPO. The court held that the claim under Section 11 (Count 6) was time-barred by the three-year statute of repose: Dammeyer

---

[2] JA133 (Compl. ¶ 191); *see also* JA96, 100-01, 103, 105, 106-07, 108-09, 112, 113, 116-17, 117, 123, 124, 128, 129, 140, 148-49, 151, 153-54, 157-58, 159-61, 162-64, 167-70 (Compl. ¶¶ 129, 137, 140, 145, 147, 149, 153, 155, 160, 162, 172, 176, 181, 184, 203, 212, 217, 219-20, 225, 228, 230, 235-36).

[3] JA65 (Compl. ¶ 38); *see also* JA54-55, 96-97, 103, 108-09, 116-17, 148-49, 151, 153-154, 157-158, 159-61, 162-70 (Compl. ¶¶ 15, 129, 140, 149, 160, 212, 217, 220, 225, 228, 230-36).

The Complaint also briefly alludes to other alleged misrepresentations (*see, e.g.*, JA159-61, 196-99 (Compl. ¶¶ 228, 266-271)) that Plaintiffs do not pursue on appeal.

challenged the accuracy of the registration statement for the SPO, which the SEC declared effective on January 14, 2005, but no Plaintiff filed a Section 11 claim until February 1, 2008.  (JA1714.)

The District Court also held that Dammeyer lacked standing to bring his claim under Section 12(a)(2) (Count 7).  Dammeyer did not adequately plead that he had actually bought shares in the SPO, as Section 12(a)(2) requires.  (JA1718-24.)

The Court granted Plaintiffs leave to amend the Complaint, potentially including to add a new Section 12(a)(2) plaintiff.  (JA1729-31.)  Plaintiffs, however, sought discovery to identify a new plaintiff who had bought shares in the SPO.  When the District Court denied that request (JA1732-37), Plaintiffs chose to pursue this appeal instead.  (*See* JA1742 n.4.)

2.    *Exchange Act Claims*

The District Court dismissed Plaintiffs' claims under Section 10(b) of the Exchange Act and the SEC's Rule 10b-5 (Count 1) because Plaintiffs failed to allege particularized facts creating a "strong inference" that Defendants acted with scienter, as required by the relevant provisions of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  (JA1652-91.)   The District Court separately analyzed the allegations against one of MMA's former Chief

5

Financial Officers, Melanie Lundquist, and concluded that Plaintiffs had failed to allege scienter adequately as to her.

### 3.  *Control-Person Claims*

Because Dammeyer failed to state a Securities Act claim and Plaintiffs failed to plead a primary violation of Rule 10b-5, their control-person claims (Counts 2 and 8) failed as well.  (JA1691, 1728.)

### 4.  *Claims Still Pending*

The District Court declined to dismiss Plaintiffs' claims under the Securities Act concerning MMA's Dividend Reinvestment Plan (Counts 3-5).  (JA1728.) Those claims remain pending.

### C.  **Interlocutory Appeal**

Pursuant to Fed. R. Civ. P. 54(b), the District Court certified a partial final judgment on Counts 1-2 and 6-8.  This appeal followed.

## COUNTER-STATEMENT OF FACTS

Plaintiffs' Statement of Facts includes a plethora of conjecture, invective, and innuendo unsupported by, and often contradicted by, the public filings and confidential witness statements upon which they base their allegations.  Set forth below is an accurate summary of the facts properly before this Court.[4]

---

[4] The Complaint refers to and incorporates MMA's public filings during and after the Class Period.  The District Court appropriately considered the full contents of those filings, as well as other judicially noticeable public documents.  *See, e.g.,*

6

## A.    MMA's Business.

During the Class Period, MMA principally arranged debt and equity financing for developers and owners of real estate and clean energy projects.[5]  This case primarily concerns one segment of MMA's business—the Company's creation of investment funds, called Low Income Housing Tax Credit Funds ("LIHTC Funds" or "Funds"), that purchased interests in partnerships that developed affordable housing projects.[6]

The developers of low-income housing projects often are entitled to income tax credits, which defray their development and operating costs and make below-market rents feasible.  Most developers, however, do not generate enough tax liabilities to take full advantage of these tax credits, and therefore sell limited partnership (or similar) interests to investors who can benefit from the credits.[7]  MMA "syndicated" (*i.e.,* sold) these tax credits by forming LIHTC Funds that purchased limited partnership (or similar) interests in multiple developers' partnerships, and then sold interests in the LIHTC Funds to investors.[8]  MMA

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *In re PEC Solutions, Inc. Sec. Litig.*, 418 F.3d 379, 388 n.7 (4th Cir. 2005).

[5] *See* JA50 (Compl. ¶ 5).

[6] *See* JA50, 65 (Compl. ¶¶ 6, 38).

[7] *See* JA56 (Compl. ¶ 17).

[8] *See* JA56-57 (Compl. ¶ 19).

7

remained as a general partner or manager of the Funds but retained only a minimal interest (usually 0.01% to 1.0%).[9]

MMA prepared its financial statements in accordance with Generally Accepted Accounting Principles ("GAAP"). Many investors purchased MMA stock to obtain its cash dividend, much of which was tax-exempt. The Company also presented a non-GAAP measure of its current earnings called Cash Available for Distribution ("CAD").[10]

### B.    The Adoption of FIN 46R.

This is not a typical accounting restatement case, where a company allegedly provided incorrect or misleading information to its outside auditors. Rather, the Complaint concerns whether a new accounting principle, FIN 46R, required MMA to begin including the LIHTC Funds' accounts (*i.e.*, each Fund's assets, liabilities, revenues, expenses, etc.) in MMA's own consolidated financial statements, even though MMA held only minimal stakes in those Funds.[11]

---

[9] *See* JA57 (Compl. ¶ 20).

[10] *See, e.g.*, JA52, 57 (Compl. ¶¶ 10, 22).

MMA believed that CAD was "the most relevant measure of its ability to pay distributions because it is a measure of current earnings." (JA447 (10-Q (May 6, 2004)).)

[11] *See* JA50, 57, 62-66 (Compl. ¶¶ 6, 20, 33-44).

8

FIN 46 was adopted in January 2003 and revised to FIN 46R in December 2003.[12]  It created new and extremely complicated standards governing when a company must consolidate its own financial statements with the financial statements of entities in which it invests.  Previously, a company generally was required to consolidate financial statements only when it owned a majority voting interest in another entity.[13]  FIN 46R, however, requires a much more complex analysis.  In broad strokes, if an entity relies on debt or other investments—other than common equity—for its capitalization, and the voting interests do not strictly relate to economic interests, then the entity is characterized as a "variable interest entity" ("VIE").  The "primary beneficiary" of the interests in a VIE must include the VIE's accounts in its own financial statements.[14]

As one accounting commentator noted, "FIN 46(R) is complex, requiring careful judgment as to whether entities are VIEs and, if so, whether consolidation is required."[15]  Whether a person is the "primary beneficiary" of a VIE can also be very complex to determine.[16]  FIN 46R required MMA and its auditors to make

---

[12] *See* JA61 (Compl. ¶ 29).

[13] *See* JA59-60 (Compl. ¶ 27); *see also* JA255-56 (FIN 46R (as issued)).

[14] *See* JA60 (Compl. ¶ 28).

[15] JA1387 (Alan Reinstein et al., *Consolidation of Variable-Interest Entities: Applying the Provisions of FIN 46(R)*, 76 CPA J. 28, 30 (Aug. 2006), *available at* http://www.nysscpa.org/cpajournal/2006/806/essentials/p28.htm).

[16] *See* JA61 (Compl. ¶ 30); JA256 (FIN 46R as issued).

numerous judgments about the nature of the many different relationships among MMA, its subsidiaries, LIHTC Funds, LTPs, investors, and developers.

MMA was first required to report under FIN 46R in its financial statements for the first quarter of 2004.[17]    MMA determined that FIN 46R required the consolidation of certain LIHTC Funds.  Consequently, the assets and liabilities of those funds—which netted at $1.3 billion—were added to MMA's financials. (JA94-95 (Compl. ¶ 127).)  MMA also disclosed that it had concluded that it was not required to consolidate the remaining LIHTC Funds, and that those Funds had net assets of approximately $900 million.[18]

MMA applied FIN 46R the same way in its annual financial statements for 2004, which were audited by PricewaterhouseCoopers ("PwC"), one of the country's largest and most prestigious accounting firms.  PwC opined—without qualification—that MMA's financial statements were presented fairly in all material respects in accordance with GAAP, including FIN 46R.[19]

---

[17] *See* JA62-63 (Compl. ¶ 33).

[18] "The Company also has a general partner interest in certain other [LIHTC Funds] where it has concluded that it is not the primary beneficiary.  Accordingly, funds with assets of $970.3 million and liabilities of $90.8 million at March 31, 2004 have not been consolidated . . . ."  JA414 (10-Q (May 6, 2004)).

[19] *See* JA684-86 (10-K (Mar. 16, 2005)).

### C.    MMA's Secondary Public Offering In 2005.

MMA conducted an SPO of stock in early 2005. To offer the stock to the public, MMA was required to register the securities with the Securities and Exchange Commission ("SEC"). MMA filed a so-called "shelf" registration statement and prospectus on January 5, 2005,[20] pursuant to which it could offer up to $500 million in stock in one or more offerings.[21] The SEC declared MMA's registration statement effective on January 14, 2005. *See* 15 U.S.C. § 77h(a).

Pursuant to SEC rules in force at the time, MMA could file a "prospectus supplement" after the registration statement became effective, without changing the effective date of the registration statement for purposes of the Securities Act. MMA filed such a supplement on February 2, 2005, which specified that the shares would be offered at the last sale price as reported on the New York Stock Exchange ("NYSE") that day.[22]

### D.    MMA's First Restatement.

On March 10, 2006, MMA announced that, on management's recommendation, the Audit Committee of the Board of Directors had concluded that the Company's financial statements covering fiscal year 2002 through the third

---

[20] JA1481-503 (S-3/A (Jan. 5, 2005)).

The registration statement made minor amendments, *see* JA1484, to a version filed two days earlier, JA1454-78 (S-3/A (Jan. 2, 2005)).

[21] JA1463 (S-3/A (Jan. 2, 2005)).

[22] JA1557-603 (SPO Prospectus (Feb. 3, 2005)).

11

quarter of 2005 should be restated. (Plaintiffs call this the "First Restatement.")[23] The First Restatement did not concern consolidation under FIN 46R.[24] In announcing the First Restatement, MMA expressly warned investors that MMA's entire financial statements "with respect to the 2002, 2003, and 2004 fiscal years should no longer be relied upon."[25]

MMA filed restated financials on June 22, 2006. PwC opined—again, without qualification—that they fairly presented MMA's financial position in all material respects in compliance with GAAP, including FIN 46R.[26]

### E. MMA's Announcement of the Second Restatement.

Even though it had just finished restating, MMA announced on September 13, 2006, that it had concluded that its financial statements covering fiscal year 2003 through the first quarter of 2006 needed to be restated to correct for more accounting errors (the "Second Restatement").[27] The announcement began a long, difficult, and expensive process that lasted more than two years.

On October 26, 2006, shortly after work on the Second Restatement began, MMA announced that it had dismissed PwC as its auditor and hired another "Big

---

[23] See JA64, 134-137 (Compl. ¶¶ 36, 194-98)); (JA819-26 (8-K (Mar. 16, 2006)). MMA actually had previously restated its financial statements in 2004. (JA468.)

[24] See JA821 (8-K (Mar. 16, 2006) (explaining four areas being restated)).

[25] JA821 (8-K (Mar. 16, 2006)).

[26] JA888, 980 (10-K (June 22, 2006)).

[27] See JA66, 153-55 (Compl. ¶¶ 41, 220-21)); JA1109-16 (8-K (Sept. 13, 2006)).

Four" firm, KPMG LLP, to replace it.[28]  In reporting this change, MMA stated—and PwC confirmed—that from 2004 through October 20, 2006, MMA had "no disagreements with PwC on any [accounting, financial-statement or audit] matter" that PwC would have had to disclose in its audit report "if not resolved to the satisfaction of PwC."[29]

### F.    MMA's Continuing Disclosures.

MMA provided investors with regular updates on the Second Restatement process, and disclosed additional errors and control deficiencies as they were discovered (although it could not issue financial statements during this period). Because the District Court's opinion recounts at length MMA's disclosures regarding its Second Restatement (JA1644-48), those disclosures are only summarized here.

The most significant update occurred on January 31, 2007, when, shortly after hiring KPMG, MMA disclosed (*inter alia*) that under FIN 46R, it would have to consolidate "substantially all" of the LIHTC Funds in which it held interests.[30] On May 4, 2007, MMA elaborated, explaining that it had identified material weaknesses in its controls over the identification of entities requiring consolidation

---

[28] *See* JA66 (Compl. ¶ 42); *see also* JA1117-25 (8-K (Oct. 26, 2006)).

[29] JA1120, 1125 (8-K (Oct. 26, 2006)).

[30] JA1370-75 (Press Release (Jan. 31, 2007)).  MMA's press releases are matters of public record of which this Court may take judicial notice. *See, e.g., Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 656-57 (4th Cir. 2004).

under FIN 46R and would be required to consolidate entities it had not previously consolidated.[31]

As MMA struggled to apply FIN 46R correctly, its costs began to mount, and it informed investors that the Second Restatement was a substantial and expensive undertaking.  In July 2007, MMA announced that it had hired an accounting consultancy firm, Navigant Consulting, Inc., to assist KPMG with the substantial work of the Second Restatement.[32]  On August 2, 2007, MMA further explained that "there are approximately 92 people currently working on the restatement.  This includes 20 company employees and 72 consultants."[33] Additionally, MMA told investors that it had not budgeted for the substantial expense of having so many people working on the restatement, and that it could not predict how much the restatement effort would cost going forward:

> *The obvious downside to these efforts is expense* . . . . [W]e currently have 72 consultants on board, but we are not done with our assessment of the work remaining. Additionally, we can't completely assess the magnitude of unbudgeted fees for our outside auditors that will result from our restatement efforts.[34]

---

[31] JA1126 (12b-25 (May 4, 2007)); *see also* JA159-61 (Compl. ¶ 228); JA1376-79 (Press Release (May 4, 2007)); JA1135-42 (8-K (July 11, 2007)).

[32] JA161-62 (Compl. ¶ 229).

[33] JA1145 (8-K (Aug. 7, 2007)); *see also* JA164-65 (Compl. ¶ 231).

[34] JA1145 (8-K (Aug. 7, 2007) (emphasis added)).

MMA had been paying regular and increasing dividends.[35]  On November 2, 2007, the Company announced another dividend increase.  This time, however, MMA warned that "due to the costs incurred by the Company in connection with the Company's previously announced restatement of its financial statements," net cash from operations might not be sufficient to pay the level of dividends it had been paying to date.[36]

On November 8, 2007, MMA reiterated publicly that its costs for the Second Restatement would "be very significant for [2007] and well into [2008]," and repeated its warning concerning the potential impact of those costs on MMA's net cash from operations, and consequently, the dividend:

> We continue to devote significant resources to our restatement task.  We have over 100 FTEs working on the restatement including company employees and consultants all working extremely hard every day to complete this process.  *The obvious downside to these efforts is expense.  Our budget for the year did not contemplate external resources of nearly this magnitude and the cost will be very significant for this year and well into next year . . . .*[37]

MMA discussed the growing risks to its business of the then-emerging credit crisis, noting "the work that is being done to restate our financial statements could affect

---

[35] *See, e.g.*, JA93, 99, 110-11, 121, 127, 130, 134, 140, 150, 155, 158-59, 165-66 (Compl. ¶¶ 123, 134, 151, 169, 179, 185, 193, 204, 215, 222, 226-27, 232-33).

[36] JA1381 (Press Release (Nov. 2, 2007)); *see also* JA165 (Compl. ¶ 233).

[37] JA1157 (8-K (Nov. 8, 2007)); *see also* JA166-69 (Compl. ¶¶ 234, 235 (emphasis removed and added)).

15

some of what we currently expect, as could a continuation or worsening of the current conditions in the capital markets."[38]

### G.    MMA's January 28 and 29, 2008 Disclosures.

Disregarding these many disclosures about the Second Restatement, its costs, and related issues, Plaintiffs allege that MMA did not disclose material facts regarding the Company's need to consolidate additional LIHTC Funds and the cost of that process until January 28 and 29, 2008.[39]   The Company's stock declined significantly on those days—by 46.57% on January 28, and by 22.42% on January 29.[40]   That decline represents the damages Plaintiffs seek to recover.[41]   Yet the January 28 and 29 disclosures merely repeated previous disclosures regarding the Second Restatement and the application of FIN 46R.   The new facts disclosed in January 2008 were that MMA was reducing its quarterly dividend—just as it had previously warned it might— from $0.52 to $0.33 per share, and that MMA would be de-listed from the NYSE because the Second Restatement was not yet complete.[42]

---

[38] JA166-67 (Compl. ¶ 234); *see also* JA1155 (8-K (Nov. 8, 2007)).

[39] *See, e.g.*, JA54-56, 66, 76, 77, 86-87, 170, 171-72, 310-11 (Compl. ¶¶ 15-16, 44, 70, 71, 94, 237-38, 240, 291-95).

[40] *See* JA171, 172 (Compl. ¶¶ 239, 241).

[41] *See, e.g.*, JA218, 219 (Compl. ¶¶ 315, 319).

[42] JA170-72 (Compl. ¶¶ 237-41).  MMA noted that its November 8, 2007 warning had been borne out; "[i]ndeed, . . . our accounting costs in the last quarter of 2007

16

## SUMMARY OF ARGUMENT

I.      The District Court correctly dismissed the SPO-based Securities Act claims, for multiple reasons.  No plaintiff who bought shares in the SPO timely filed a claim before the expiration of the statute of repose.  Indeed, no proper Securities Act plaintiff is before the Court at all:  Dammeyer, the sole plaintiff asserting these claims, has provided no plausible allegation that the shares he purchased came from the SPO at all, rather than from the millions of MMA shares that already were trading on the secondary market.

The Section 11 claim is time-barred because the three-year statute of repose began running when the securities were "bona fide offered to the public," which was the date the registration became effective, as federal courts broadly and unanimously agree.  Under the rule at the time of the SPO, a prospectus supplement setting the offering price did not reset the statute of repose.  The SEC has since changed that rule, but not retroactively.  That the SEC had to change its rule to (partially) adopt Plaintiffs' view of timing underscores that before the rule change, Plaintiffs' view was simply incorrect.

Dammeyer lacks standing in any event, because he did not buy securities in the SPO.  His bare, conclusory allegation that he bought "pursuant and/or traceable to" MMA's prospectus is not enough to plead standing, and the only evidence on

were even higher than we had expected them to be."  (JA1178 (8-K (Jan. 29, 2008)).)

17

which he relies—the confirmation slip from his trade—actually *confirms* that he did not buy in the SPO, but in the secondary market, on a later date and at a different price.

II.    The Exchange Act claims also fail for multiple reasons.  Plaintiffs have shifted their arguments and now claim that the supposed fraud concerned the costs of carrying out the Second Restatement—not the accounting errors that caused MMA voluntarily to restate its financials.  But they fail to support that theory with the necessary "particularized facts" or to create a "strong inference" of scienter.  MMA worked hard to fix its accounting and amply disclosed to the investing public the scope of the restatement; the large number of employees and outside experts working on it; the fact that the costs had exceeded the budget; and—significantly—the possibility that the restatement might affect MMA's ability to continue paying dividends at the same level.  The only nonpublic facts Plaintiffs offer—allegations by confidential witnesses—add absolutely nothing to establish that any Defendant knew, but knowingly or recklessly concealed, the cost of the Second Restatement.  Ultimately, Plaintiffs are left with nothing but conclusory, generic assertions about motive and a handful of unremarkable stock trades, by three out of 13 individual Defendants, *before* the Second Restatement even began.  The District Court correctly concluded that Plaintiffs had failed to raise anything approaching a "strong inference" of scienter.

18

MMA's disclosure of the pertinent facts also dooms Plaintiffs' theory of loss causation. The stock decline in January 2008 could not have been based on revelations about the cost of the Second Restatement. The pertinent information about the restatement's scope, the personnel involved, and the possible effect on the dividend was already public.

## ARGUMENT

## I.     THE DISTRICT COURT CORRECTLY DISMISSED THE SECURITIES ACT CLAIMS.

### A.     The District Court Correctly Held That Plaintiffs' Section 11 Claims Were Barred by the Three-Year Statute of Repose.

The Securities Act's statute of repose imposes a strict three-year time limit on claims brought under Section 11. The statute provides that "*[i]n no event*" shall an action "be brought to enforce a liability created under . . . [Section 11] . . . more than three years after the security was bona fide offered to the public." 15 U.S.C. § 77m (emphasis added). Because the SEC declared the SPO registration statement effective on January 14, 2005,[43] the District Court correctly held that securities were bona fide offered on that date. (JA1714.) MMA therefore became entitled to the benefit of the statute of repose on January 14, 2008. Because none

---

[43] JA560.

of the Plaintiffs asserted any Section 11 claim until February 1, 2008,[44] their claims are time-barred.

As the leading decision explains, "in the case of *registered* securities"—such as those at issue here—"the date of registration has been treated as the date that starts the running of the repose period (most relevantly in the context of § 11 claims)." *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 99, 104 (2d Cir. 2004) (emphasis added).  Bona fide means simply "genuine[]" as opposed to "simulated." *Id.* at 99.  Registration removes the main legal impediment to selling securities. *See* 15 U.S.C. § 77e(a).  If an offering has been registered and the registration statement has become effective, nothing more is required for the offering to become bona fide.  Every other court to decide the issue has likewise held that the statute of repose is triggered (at the latest) when a registration statement becomes effective.[45]  Although, as discussed below, some conditions not present here may later *reset* the repose period, Plaintiffs do not cite a single case—

---

[44] *See infra* Section I.C.

[45] *See*, *e.g*., *In re Adelphia Commc'n Corp. Sec. & Derivative Litig.*, 2005 WL 1679540, at *6 (S.D.N.Y. July 18, 2005) ("It is well-settled in this Circuit that the limitations period governing [Section] 11 claims challenging an offering of registered securities accrues from the effective date of the governing registration statement"); *Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992); *In re Metro. Sec. Litig.*, 2010 WL 537740, at *1 (E.D. Wash. Feb. 8, 2010); *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *6 (C.D. Cal. Apr. 6, 2009).

from any time over the entire 80-year history of Section 13—holding that an effective registration statement is insufficient to start the repose clock running.

Plaintiffs contend that the SPO securities were not "bona fide offered" on January 14, 2005, because "the public did not learn" on that date that the SEC had declared the registration statement effective. (Appellants' Br. 20.) But a plaintiff's knowledge of the triggering event is irrelevant to Section 13 and to any statute of repose, which "allows for no qualification emanating from the [plaintiff's] circumstances." *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1300 (4th Cir. 1993). By its very nature, a statute of repose "runs from a fixed date readily determinable by the defendant," not "a date determined by the personal circumstances of the plaintiff." *Id.* at 1300 n.7.

Relying on snippets from inapposite contract-law cases, Plaintiffs argue (for the first time on appeal) that the statute of repose could not have started running until after the securities were priced, which was done through the filing of a prospectus supplement. (Appellants' Br. 21.) According to Plaintiffs, an "offer" necessarily requires a price term. (Appellants' Br. 22.) That argument has been waived, is incorrect as a matter of contract law,[46] and misreads the Securities Act's

---

[46] *See, e.g.*, *Restatement (Second) of Contracts* § 33 cmt. e (parties may form a contract without agreeing on price). If a contract need not include a price term, plainly an offer need not include one.

21

broad and unique definition of "offer."[47]   An offer must be "for value," in that it does not cover attempts to give away securities for free, 15 U.S.C. § 77b(a)(3), but the mere fact that the price will be set by the market on a future date does not prevent a registered offering from being an "offer."  *See, e.g.*, *Diskin v. Lomasney & Co.*, 452 F.2d 871, 873, 875 (2d Cir. 1971) (letter expressing willingness to sell shares "at the public offering price when, as and if issued" was an "offer" within the meaning of the Securities Act).

The SEC's rulemakings have eliminated any possible doubt.  The SEC has long recognized that a so-called "shelf" registration statement and prospectus may omit "numerical details such as price."  47 Fed. Reg. 11,380, 11,396 (Mar. 16, 1982).  Such "details" may be included in a prospectus supplement (informally, a "sticker") after the registration statement takes effect.  *See id.*  Under the rules at the time of the SPO, a prospectus supplement making minor changes—such as setting the offering price—did *not* restart the statute of repose.  Item 512(a) provided that only a more significant change to the shelf registration statement— known as a "post-effective amendment"—would restart the statute of repose:  a mandatory post-effective amendment "shall be deemed to be a new registration statement . . . and the offering of such securities at that time shall be deemed to be

----

[47] An offer includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in an security, for value."  15 U.S.C. § 77b(a)(3).

the initial bona fide offering thereof." 17 C.F.R. § 229.512(a)(2) (2004). Here, as Plaintiffs have conceded, MMA did not—and was not required to—file any such "post-effective amendment." (*See* JA1710.)[48] Rather, it filed a shelf registration statement and then a prospectus supplement listing the price.[49] As one of Plaintiffs' own cases makes clear, a "post-effective pricing supplement" does not "reset" the statute of repose. *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 171 (S.D.N.Y. 2012) (finding no authority for the "claim that the clock is reset by the filing of pricing supplements").[50]

After MMA's SPO, the SEC adopted a new rule—one that would have been completely unnecessary if Plaintiffs' theory were correct. For shelf registrations *after* December 1, 2005, the SEC provided that filing a "prospectus supplement" would start a new repose period, but *only* as to the issuer and underwriters. *See* 17 C.F.R. §§ 229.512(a), 230.430B(f)(2); 70 Fed. Reg. 44,722, 44,773 (Aug. 3, 2005); *Footbridge Ltd. Trust v. Countrywide Fin. Corp.*, 770 F. Supp. 2d 618, 623 (S.D.N.Y. 2011). Under Plaintiffs' view of the law, however, the amendment was

---

[48] Item 512(a) required issuers to file post-effective amendments in only three situations, none of which applied to MMA. *See* 17 C.F.R. § 229.512(a)(1) (2004).

[49] *See* JA1456 (S3 (Jan. 3, 2005)); JA1557 (SPO Prospectus (Feb. 3, 2005)).

[50] This case contrasts sharply with those in which a shelf registration statement omits "critical disclosures" and correcting the deficiency works a "fundamental change"; such cases have long required a post-effective amendment that resets the repose clock. *See Fed. Hous. Fin. Auth. v. UBS Ams.*, 2012 WL 2400263, at *3-4 (S.D.N.Y. June 26, 2012).

23

unnecessary and the limitation to issuer and underwriter defendants was ineffective:  Plaintiffs insist that MMA's prospectus supplement restarted the statute of repose, as to *any* potential defendant, irrespective of the SEC's regulations.  With good reason, no court has ever held that the SEC so dramatically misunderstood its own regulatory scheme.  Rather, courts have respected the SEC's determination that its new "Rule 430B is not retroactive."  *In re Countrywide Fin. Corp. Sec. Litig.*, 2009 WL 943271, at *5.  MMA's prospectus supplement came before Rule 430B, and did not restart the repose period.

Plaintiffs simply miss the mark with their observation that a different provision of the Securities Act, 15 U.S.C. § 77d(a)(3)(B), distinguishes between the "effective date of . . . registration" and the "date upon which the security was bona fide offered to the public."  (Appellants' Br. 24.)  Plaintiffs contend that the effective date under Section 13 therefore cannot be the same as the date the bona fide offer begins.  But they are attacking a straw man:  no one contends that the two dates will *always* be the same.

Securities may be "bona fide offered" *before* the effective date of a registration statement.  For example, where *unregistered* securities are offered to the public, the statute of repose starts running without waiting for a registration statement that will never be filed.  *P. Stolz*, 355 F.3d at 99-100.  There are also various "legal ways in which offers now may be made during the waiting period"

after a registration statement is filed but before it becomes effective. Louis Loss, Joel Seligman & Troy Paredes, *Securities Regulation* 751 (4th ed. 2006); *see also* 15 U.S.C. § 77e(c) (prohibiting "offer[s] to sell or offer[s] to buy . . . any security" only until registration statement is filed).

Thus, Plaintiffs misinterpret Congress's decision to use the "bona fide offered" date in Section 13's statute of repose. Using the "effective date," as Plaintiffs propose (Appellants' Br. 24-25), would have completely eliminated repose in cases involving unregistered securities with no effective date—an "absurd result," *P. Stolz*, 355 F.3d at 99. Congress thus used the "bona fide offered" language to capture cases involving unregistered securities or securities offered before registration becomes effective. That is why courts have occasionally stated that "generally" or "ordinarily" a security is bona fide offered to the public on the effective date of registration—language that Plaintiffs quote but misunderstand. *E.g., Finkel*, 962 F.2d at 173. None of those cases suggests that the date of the first bona fide offer can be after the effective date: effective registration is an indisputable "manifestation of . . . the genuineness of the offer to the public." *P. Stolz*, 355 F.3d at 99.

Finally, Plaintiffs cursorily suggest that the repose period should run from the date that securities were *last* bona fide offered to the public. (Appellants' Br. 28-29.) Plaintiffs cite no authority for that proposition, which the Second Circuit

25

flatly rejected in *P. Stolz* on the advice of the SEC, which filed an amicus brief. 355 F.3d at 100-02; *see* Brief of the Securities and Exchange Commission, Amicus Curiae, Submitted at the Request of the Court, *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92 (2d Cir. 2004), 2003 WL 23469695. Plaintiffs' last-offered test would create precisely the sort of "lingering liability" that Congress expressly rejected by adopting a statute of repose, which operates predictably and cannot be tolled. *P. Stolz*, 355 F.3d at 105.[51] Plaintiffs' reading of the statute also would violate the canon against surplusage, by rendering superfluous a statutory provision dealing with the repose period for certain kinds of securities that are issued pursuant to an amended registration during an offering: "This provision would have been unnecessary if the three-year [repose] period did not start until the end of an offering." *Id.* "[M]ost leading commentators" likewise have already rejected Plaintiffs' argument. *Id.* at 101-02. This Court should do the same.

The District Court correctly applied well-established law in holding that the time to sue over MMA's registration statement began when that statement became effective. Dammeyer's Section 11 claims were accordingly untimely.[52]

---

[51] *See also Caviness*, 983 F.2d at 1300 n.7.

[52] Ms. Lundquist did not sign the registration statement for the SPO, and Plaintiffs do not appeal the dismissal of the Section 11 claim against her on that basis. (JA1696-97.)

26

**B.    Dammeyer Has Not Pleaded Facts Supporting a Plausible Inference That He Has Standing.**

The District Court correctly dismissed Dammeyer's Section 12(a)(2) claims for failure to allege enough facts to support a plausible inference that Dammeyer had standing.  Tellingly, when the District Court gave Plaintiffs leave to amend, Plaintiffs forwent the opportunity to allege clearly that Dammeyer purchased in the SPO.  Instead, they requested discovery to seek another named plaintiff with a better claim to standing.  (JA1736.)[53]  Because Dammeyer quite clearly did *not* purchase in the SPO, the District Court correctly held that he lacks standing.

Section 12(a)(2) provides that any person who "offers or sells" a security by means of a prospectus containing a materially false statement or omission shall be liable to any "person purchasing such security from him."  15 U.S.C. § 77*l*(a)(2).  Plaintiffs do not dispute that Dammeyer can have standing to bring such a claim *only* if he purchased securities *directly in the relevant public offering* rather than in the secondary market.  *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 578 (1995) (liability under Section 12(a)(2) is "limited to public offerings"); Appellants' Br. 30-32.

The Complaint does not allege that Dammeyer met that requirement.  Rather, it alleges that Dammeyer purchased "pursuant and/or traceable to the SPO

---

[53] The District Court properly denied that request, and Plaintiffs do not challenge that decision.

Registration Statement and Prospectus." (JA89 (Compl. ¶ 103).) That conclusory, equivocal recital is insufficient as a matter of law to demonstrate that Dammeyer purchased directly in the offering. Indeed, as the District Court correctly determined, the Complaint actually demonstrates that Dammeyer did *not* do so. (JA1722, 1724.) Shares were issued pursuant to the SPO Statement "[o]n February 2, 2005, . . . priced at $26.51 per share." (JA111 (Compl. ¶ 152).) Dammeyer certified that he bought stock *a day later*, *at a different price*. (JA244.)

Plaintiffs offer no response to the District Court's analysis of their allegations.[54] Instead, they erroneously state that they can show standing with a single piece of evidence, Dammeyer's confirmation slip, which they assert shows (1) that Dammeyer purchased his shares "directly from 'RBC,' one of the Underwriter Defendants"; and (2) that Dammeyer would receive a prospectus (the slip stated "PROS UNDER SEP COVER"). (Appellants' Br. 30-32.) But the confirmation slip is fully consistent with Dammeyer's purchasing in the secondary market, not the SPO.

*First*, the slip confirms that Dammeyer bought shares a day after the SPO and at a different price than the offering price. He also paid commissions to compensate his broker. (JA1606.) Underwriters who sell actual offering shares,

---

[54]    Below, Appellants erroneously tried to suggest that shares in the SPO might have been sold at different prices. (JA1722-23.) In fact, the offering price was set at "$26.5100." (JA1557.)

however, sell them at the offering price; they are compensated by receiving a discount when they buy the shares from the issuer. *See, e.g.*, Samuel N. Allen, *A Lawyer's Guide to the Operation of Underwriting Syndicates*, 26 New Eng. L. Rev. 319, 328-30 (1991); (JA1590 (detailing the compensation for the Underwriters in the SPO).) Had Dammeyer actually purchased in the offering, the slip would have reflected the underwriter's discount in the "Mark Up/Mark Down" column. Dammeyer's showed a commission instead. (*See* JA1606.)

*Second*, RBC is both a prominent registered broker-dealer *and* an underwriter.[55] Thus, purchasing through RBC is not necessarily purchasing in an offering.

*Third*, the reference to a prospectus is immaterial. Dammeyer bought at a time when the prospectus delivery requirement also applied to shares sold in the secondary market. For 40 days after MMA shares were bona fide offered to the public, sales of all shares had to be "accompanied or preceded by a prospectus" when sold. 15 U.S.C. § 77e(b). The SEC's rules clarify that for sales during that time, the obligation to deliver a prospectus also applies to dealers (with some exceptions). *See* 17 C.F.R. § 230.174; *see also* 15 U.S.C. § 77d(a)(3)(B). Thus, the delivery of a prospectus says nothing about which type of purchase Dammeyer made.

---

[55]     *See* http://www.adviserinfo.sec.gov.

Thus, both the Complaint and the confirmation slip show that Dammeyer did not purchase in the SPO, but in the secondary market.

Dammeyer similarly fails to plead standing under Section 11. "[W]hen a company has offered shares under more than one registration statement, aftermarket purchasers usually will not be able to trace their shares back to a particular offering. Thus, . . . [P]laintiffs had to allege facts from which [the Court] can reasonably infer that their situation is different." *In re Century Aluminum Co. Sec. Litig.*, 2013 WL 1633094, at *3 (9th Cir. Apr. 17, 2013). At the time of Dammeyer's purchase, however, MuniMae had offered the overwhelming majority of its outstanding shares under *other* registration statements. (JA1598 (MuniMae had more than 35 million shares outstanding in 2004).) Yet Dammeyer fails to plead any facts from which the Court could infer that his shares were traceable to the SPO in particular.

### C.    Dammeyer's Claims Are Independently Untimely.

Dammeyer did not himself assert *any* claims until the Complaint was filed, in December 2008—well after February 3, 2008, when Plaintiffs must concede the statute of repose had run.[56] The only plaintiff who asserted Securities Act claims

---

[56] JA244. That is also the repose date for Dammeyer's Section 12(a)(2) claim because it is "three years after the sale." 15 U.S.C. § 77m.

*before* that date was Paul Engel.[57]  But the pendency of Engel's action cannot toll the statute of repose, which is "'absolute' and not subject to equitable tolling," including during the pendency of a putative class action.  *Police & Fire Ret. Sys. v. IndyMac MBS, Inc.*, No. 11-2998, 2013 WL 3214588, at *5-7 (2d Cir. June 27, 2013); *see Lampf, Pleva, Lipkind, Prupis & Petrigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).  And even if the statute of repose could be tolled, Engel could not toll it, because Engel evidently lacked constitutional standing to assert SPO-related claims in the first place:  Engel did not purchase in the SPO, and he asserts no SPO-related claims in the Complaint.[58]  Without standing, Engel did not properly invoke federal jurisdiction and could not toll the repose period to benefit a later, untimely filer like Dammeyer.  *See, e.g.*, *In re Direxion Shares ETF Trust*, 279 F.R.D. 221, 236-37 & n.9 (S.D.N.Y. 2012).

This Court can affirm the judgment on any ground supported by the record. Here, the untimely attempt to add Dammeyer as a plaintiff independently justifies the dismissal of the Securities Act claims.

---

[57] *See* Compl. ¶¶ 67, 77, *Engel v. Mun. Mortg. & Equity LLC*, No. 08-CV-292 (D. Md. filed Feb. 1, 2008).

[58] *See* JA 89, 232-41 (Compl. ¶¶ 104, 357-386).

## II.    THE DISTRICT COURT CORRECTLY DISMISSED THE CLAIM UNDER EXCHANGE ACT RULE 10b-5.

MMA's attempts to comply with FIN 46R were extensive and arduous.  In the District Court, Plaintiffs repeatedly claimed that the supposed fraud was MMA's failure to consolidate VIEs pursuant to FIN 46R—that MMA purportedly was dishonestly seeking to keep the VIEs' liabilities off its balance sheets (even though the VIEs' assets were in fact much greater than their liabilities).   The District Court properly rejected that theory, and Plaintiffs have largely abandoned it on appeal.  (Appellants' Br. 33-36.)

Plaintiffs' new "fundamental theory" is that Defendants concealed how much consolidating the VIEs would cost.  (Appellants' Br. 36.)  That theory fares no better.  Nowhere in their 196-page Complaint do Plaintiffs allege particularized facts to show that Defendants knew throughout the Class Period that the FIN 46R accounting was incorrect but hid that fact from investors to conceal the cost of the restatement.   Instead, the record shows that MMA disclosed the need to consolidate many more entities under FIN 46R, disclosed weaknesses in its controls regarding consolidation, and voluntarily undertook a restatement process to remediate any accounting problem.  As MMA was incurring the lion's share of the restatement expense—which occurred only after the retention of Navigant in 2007—MMA kept investors informed, including warning about the potential effect on MMA's dividend.  The stock price did not drop as the market absorbed this

32

information.  Accordingly, Plaintiffs have failed to plead *either* a cogent claim that any Defendant acted with scienter *or* a plausible claim that any Defendant's alleged actions caused Plaintiffs to suffer any loss.  Each deficiency is fatal to Plaintiffs' Exchange Act claims.

### A.    The Pleading Standards for Scienter.

To state a claim of securities fraud under Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).  The District Court correctly held that Plaintiffs failed to adequately allege scienter as to all Defendants (JA1682-83), and independently as to Ms. Lundquist (JA1683-84).

Even under ordinary pleading standards, a plaintiff cannot simply recite that the defendant acted with the requisite knowledge or state of mind.  Such bare averments are ultimately legal conclusions, and are not entitled to be taken as true on a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009).

In two respects, the PSLRA imposes a heightened standard for pleading scienter in securities cases.  *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 n.5 (4th Cir. 2011); *GSC Partners CDO Fund v. Washington*, 368 F.3d 228,

33

237 (3d Cir. 2004). First, a plaintiff may not rest on general allegations that the defendant knew its statements were false, or otherwise acted with scienter. *GSC*, 368 F.3d at 239. The plaintiff must "state with particularity" the "facts giving rise to" its scienter allegations. 15 U.S.C. § 78u-4(b)(2). Allegations that a person "must have known" certain facts are not particularized and do not satisfy the pleading burden. *See, e.g.*, *GSC*, 368 F.3d at 239.

Second, the allegations, taken as a whole and together with all judicially noticeable facts and documents incorporated into the complaint by reference, must "giv[e] rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *see Tellabs*, 551 U.S. at 322. When the Court weighs the plausible explanations of the facts, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw." *Tellabs*, 551 U.S. at 324 (emphasis added).

The allegations must independently satisfy the PSLRA's pleading standards with respect to *each* defendant. *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 190 (4th Cir. 2009).

### B. Plaintiffs Failed To Plead Particularized Facts Showing That Defendants Acted With Scienter.

Plaintiffs' new "fundamental theory" fares no better than the one they primarily advanced in the District Court, and indeed, they face a difficult task

trying to support it with the allegations they crafted to support their now-abandoned theory. The Complaint contains no particularized factual allegations that Defendants knew the FIN 46R accounting was incorrect or required restatement before the Company undertook to correct it, which was after the Second Restatement began and MMA changed auditors. Obviously, Defendants could not have intended to deceive investors by hiding potential restatement costs that they did not then believe MMA had to incur. Moreover, Plaintiffs provide no particularized allegations of fact that support any inference that Defendants knew and attempted to conceal the fact that the cost of restatement (which, as the Company's repeated disclosures indicated, kept growing beyond expectations) would impact the dividend. Indeed, Plaintiffs do not even allege that the effect on the dividend could have been known before MMA disclosed it, without also knowing that the credit crisis would significantly reduce MMA's revenues and severely impact its liquidity.

The Complaint relies upon two categories of sources: MMA's own public disclosures (which this Court must consider in their entirety, not just as selectively quoted by Plaintiffs) and three "confidential witnesses." These sources show that MMA started incurring significant costs in mid-2007, when it hired Navigant Consulting to assist its auditor in analyzing the relevant Funds, and that MMA disclosed those expenses in appropriate detail at proper times. Nothing in

35

Plaintiffs' source material suggests that MMA misrepresented or failed to make a required disclosure regarding the costs of the Second Restatement.

MMA has repeatedly stated that the bulk of the restatement costs were incurred after outside consultants were hired in the summer of 2007, and MMA promptly disclosed that retention as well.[59]  Plaintiffs do not contend that MMA hired those consultants earlier, and then concealed their costs.  Nor do they contend that MMA ever misstated the cost of those consultants' work (*e.g.*, attempting to quantify them only to state later that the actual costs were higher).

Rather, Plaintiffs rely on a theory completely unsupported by these public filings:  that senior executives knew in early 2006 that "the task was going to be enormous and the costs prohibitive."  (Appellants' Br. 37.)  But Plaintiffs provide *no* particularized factual allegations to support that knowledge.  Plaintiffs' core allegation—that Defendants knew throughout the Class Period that MMA would incur "massive cost[s]" to correct its FIN 46R accounting (JA52 (Compl. ¶ 11))— is a conclusion, not a particularized allegation that must be taken as true.  Plaintiffs have no such particularized allegations.  Nowhere do they describe a single meeting, report, or other source forecasting the high costs of the Second

---

[59] *See, e.g.*, JA1136 (8-K (July 11, 2007)); JA1143-52 (8-K (Aug. 7, 2007)); JA1154-63 (Press Release (Nov. 2, 2007)); JA1381-82 (8-K (Nov. 8, 2007)).

Restatement, much less one predicting how those costs would ultimately impact the dividend.

Plaintiffs' "confidential witnesses" do not provide any support for the theory that Defendants knew MMA's FIN 46R accounting was incorrect, but intentionally or recklessly concealed the "astronomical" costs of that accounting. (Appellants' Br. 34.) Plaintiffs cannot use confidential witnesses to carry their burden without supporting their "apparent reliability" with facts that corroborate the sources or demonstrate a "probability that a person in the position occupied by the source would possess the information alleged." *Teachers' Ret. Sys. v. Hunter* ("*Teachers*"), 477 F.3d 162, 174 (4th Cir. 2007) (internal quotation marks and citations omitted); *see also Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (recommending that courts evaluate CWs' allegations at the threshold and steeply discount allegations that lack corroboration, detail, and other supportive indicia).

"CW1" and "CW3" cannot bolster Plaintiffs' costs-of-the-restatement theory with any "apparent reliability." "CW3" left MMA in March 2006, before the Second Restatement or the re-examination of the Company's FIN 46R accounting had even started. (JA84 (Compl. ¶ 88).) No allegation regarding CW3's knowledge even mentions the costs of that restatement—let alone indicates that those costs were being concealed or would be exceedingly high. (*See* JA83-85

(Compl. ¶¶ 86-90).)   Similarly, the allegations regarding "CW1's" knowledge nowhere mention the costs of the Second Restatement and say nothing about whether Defendants knew about them, or when.  (*See* JA80-81 (Compl. ¶¶ 80-81).)

Plaintiffs therefore place near-total reliance on conclusory allegations from "CW2" to support their theory that MMA knew that the FIN 46R accounting required restatement and that because senior management had "first-hand knowledge about the scope and massive scale of the restatement process," they must have known that the costs would have a "devastating effect" on CAD.  (JA83 (Compl. ¶ 85).)   But CW2 never states that Defendants actually knew, but concealed from investors, the costs of the Second Restatement.  Nor does CW2 provide any information regarding how senior management could have known the extent of these costs before the Second Restatement process even started.  (*See* JA83 (Compl. ¶ 85).)

Rather, CW2 makes a bare assertion that some MMA personnel concluded at some point in early 2006 that most of the LIHTC Funds should have been consolidated.  This allegation, however, sheds no light on whether Defendants knew how much consolidation would *cost*.  (*See* JA81-83 (Compl. ¶¶ 82-84).) Moreover, the allegation that MMA concluded prior to 2007 that additional Funds required consolidation should itself be heavily discounted.  CW2's allegations are inconsistent as to who at the Company purportedly concluded that the FIN 46R

accounting was incorrect and when they did so.  (*Compare* JA82 (Compl. ¶ 82), *with* JA177 (Compl. ¶ 247(h)).)  The CW2 allegations contradict Plaintiffs' own theory that Defendants were aware from the outset of a Class Period beginning in 2004 that the FIN 46R accounting was incorrect.  The independent auditor, PwC, signed off on the accounting as late as June 22, 2006.  (JA 980 (10-K (June 22, 2006).)  And the CW2 allegations cannot explain why, if Defendants intended to deceive investors, they would voluntarily disclose the need to restate and then regularly update investors about the restatement process's expense.  The inconsistent and conclusory nature of the CW2 allegations shows that they should be given little weight.  *Tellabs*, 551 U.S. at 326.

The general allegation, based on CW2's assertions, that MMA must have known that restating would be a substantial task (JA83 (Compl. ¶ 85)) adds little to the analysis because MMA repeatedly disclosed that fact to the investing public.[60] MMA undertook the Second Restatement on its own initiative[61] and committed significant resources to getting it right.  It involved its outside auditors at every step, and hired outside consultants to assist.[62]  And it continually disclosed the

---

[60] *See* JA1143-52 (8-K (Aug. 7, 2007)); 1154-63 (8-K (Nov. 8, 2007)).

[61] *See* JA1112-13 (8-K (Sept. 13, 2006)) (stating that management "identified" the errors in the Second Restatement and "recommend[ed]" to the Audit Committee that the affected financial statements be restated).

[62] *See In re H&R Block Sec. Litig.*, 527 F. Supp. 2d 922, 930 (W.D. Mo. 2007) ("[T]he fact of the investigation, especially because it was undertaken with the help

costs and difficulties of the Second Restatement process.  As this Court has observed, that Defendants, and not some outside entity, initiated and disclosed the inquiry into the accounting problems at issue lends weight to an "inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform investors of their internal control and financial reporting problems." *Matrix*, 576 F.3d at 189.

Plaintiffs' reference to a Fall 2006 memorandum noting that the Second Restatement would be the Company's main focus and that overtime would be mandatory (Appellants' Br. 41) only supports MMA's case.  First, there is no allegation that the memorandum discussed FIN 46R.  (JA81 (Compl. ¶ 81).)  The Second Restatement involved multiple issues.  (*See* JA154 (Compl. ¶ 220); JA1112-13 (8-K (Sept. 13, 2006)).)  Second, the allegation that the Company incurred employee overtime does not refute its public statements that much of the expense of the restatement was incurred much later when outside consultants were hired.  Third, even if the memorandum did relate to the FIN 46R restatement, devoting extraordinary resources to the restatement was exactly what MMA should have done.  That MMA instructed its personnel that the restatement was its "main

---

of an independent auditor, negates an inference of an intent to deceive the investing public." (citation omitted)).

focus" shows only the strength of MMA's commitment to getting the accounting right.

### C. All of Plaintiffs' Scienter Allegations Together Fail to Create a Cogent or Compelling Inference that Defendants Acted Knowingly or Recklessly.

Because Plaintiffs' allegations lack the particularity or factual support necessary to plead scienter under the PSLRA, Plaintiffs seek to bolster them with a number of undisputed, yet essentially irrelevant facts. For example, they claim that the Company sought to make a profit, that several Defendants were senior executives, and that a few Defendants sold Company stock at various times during the years-long Class Period. (Appellants' Br. 44, 49, 50-51.) Plaintiffs indiscriminately throw in facts from throughout the lengthy Class Period—including transactions years before the Second Restatement, as the District Court correctly pointed out. (JA1680). Indeed, the District Court's observation is even more salient now that Plaintiffs' "fundamental theory" relies on the costs of restating, because there is no evidence that at the time of those transactions, Defendants knew and concealed that a restatement would be needed, *and* how much it would cost, *and* the impact of that expense.

Even taken collectively, these allegations cannot rebut the more compelling, nonculpable explanation the District Court found: that MMA struggled for a long period with how to apply FIN 46R, struggled with the enormous difficulty and

41

expense of doing so, and kept investors informed about new and unanticipated events as they occurred.

### 1. Plaintiffs' Generic Allegations of Corporate Motive or Knowledge Cannot Support a Strong Inference Of Scienter.

Much of Plaintiffs' attempt to plead scienter rests on conclusory allegations that the purported fraud yielded various generic financial benefits. Plaintiffs offer several variations on this theme, arguing that Defendants had a motive to sell stock to the public at inflated prices in both public and private offerings, fund corporate acquisitions with inflated shares, obtain new financing, avoid defaulting on debt covenants, and borrow on favorable terms. (Appellants' Br. 49-50; *see also* JA86, 191-192 (Compl. ¶¶ 92, 254-56).)

Courts routinely disregard such generic allegations of financial motive. As this Court has explained, such motives are "common to every company" and "add little to an inference of fraud." *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) (allegations that defendants were motivated to raise capital insufficient to support a strong inference of scienter). Similarly, this Court described a series of allegations of "possible financial motives," such as "maintaining positive relationships with creditors, avoiding additional interest payments, and promoting future acquisitions," as "generalized motives . . . shared by all companies" that are insufficient to plead scienter. *Ottmann v. Hanger*

*Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (citations omitted).[63]  If

scienter could be pleaded on these bases alone, "virtually every company in the

United States that experiences a downturn in stock price could be forced to defend

securities fraud actions." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP

Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (internal quotation marks

omitted).   Accordingly, Plaintiffs' generic "motive" allegations should be

disregarded here.

Similarly unavailing are Plaintiffs' generic allegations that individual

Defendants must have known that the FIN 46R accounting was incorrect because

they held high positions in the Company.  (Appellants' Br. 44-46.)  Again, these

types of allegations could be made in virtually every case, and courts routinely

---

[63] *Accord GSC*, 368 F.3d at 237 ("[M]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." (internal quotation marks omitted)); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008) ("Scienter in a particular case may not be footed solely on motives universal to corporate executives [such as maintaining a high credit rating].");  *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005) ("The desire to make a company seem more profitable is a desire universally held among corporations and their executives, and thus is insufficient to prove scienter as a matter of law." (internal quotation marks and citations omitted)); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1269 (10th Cir. 2001) (holding that the "generalized motives shared by all companies and which are not specifically and uniquely related to [the defendant] in particular" are insufficient to plead scienter); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (rejecting the proposition that "a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud").

reject them. "Plaintiffs cannot claim that the individual [defendants'] titles or positions at [the company] establish that they must have known of the alleged fraud." *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 573 (D. Md. 2005) (internal quotation marks omitted) (collecting cases).[64]

The mere fact that the LIHTC business is allegedly "core" to MMA is another make-weight allegation without legal significance. Indeed, the sole case Plaintiffs cite actually rejects such an inference. *In re Constellation Energy Grp., Inc.*, 738 F. Supp. 2d 614, 635 (D. Md. 2010).[65]

Under the PSLRA, Plaintiffs must plead scienter with "particularized facts," not unsupported conclusions. They cannot satisfy that burden by alleging that Defendants "must have" known certain facts simply because of who Defendants are or what the facts were. Treating scienter as self-establishing would wholly circumvent the need to plead scienter with particularity.

## 2. Plaintiffs' Allegations of Firings and Resignations Do Not Support A Strong Inference of Scienter.

MMA's dismissal of PwC in October 2006 does not support any inference that Defendants knowingly concealed problems with FIN 46R accounting or the

---

[64] *Accord Ind. Elec. Workers*, 537 F.3d at 535 ("'[P]leadings of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company.'").

[65] *Accord Elam v. Neidorff,* 544 F.3d 921, 929 (8th Cir. 2008) (rejecting a "core operations" argument and noting that the Fifth and Ninth Circuits have rejected that approach altogether).

cost of the Second Restatement. (Appellants' Br. 42-43.) There is no particularized factual allegation indicating that the two events were in any way related. Indeed, PwC consistently signed off on MMA's handling of FIN 46R[66] and, upon its dismissal, attested that it did not disagree with MMA "on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure, which disagreements if not resolved to the satisfaction of PwC would have caused [PwC] to make reference thereto in their reports on [MMA's] financial statements."[67] In light of that specific statement that there was no disagreement, *see Brockton Ret. Sys. v. Shaw Grp. Inc.*, 540 F. Supp. 2d 464, 474-75 (S.D.N.Y. 2008), PwC's dismissal does not suggest that Defendants believed in October 2006 that MMA's FIN 46R accounting required restatement, let alone that they knew, but concealed, the costs of any such restatement process.[68]

Likewise, Plaintiffs fail to connect the resignations of Defendants Harrison, Lundquist, Pinckney, and Kay to an inference of wrongdoing. (Appellants' Br.

---

[66] *See, e.g.*, JA980.

[67] JA 1120, 1125 (8-K (Oct. 26, 2006)).

[68] Based on purported statements from CW3, Plaintiffs allege that PwC disagreed with the Company over the consolidation of LIHTC Funds. CW3, however, left the Company by March 2006—seven months before PwC stated that there were no such disagreements. (JA84 (Compl. ¶ 88).) Moreover, CW3's statement appears to address events in 2004, not in 2006. CW3 states that the discussions over FIN 46R had been going on for months prior to a restatement regarding "Defendant Joseph's retirement package." (JA 88, 156 (Compl. ¶¶ 88, 223).) The restatement of Mr. Joseph's deferred compensation package, however, took place in 2004—not in 2006. (JA468.)

45

43.)  *See, e.g., Glaser v. The 9, Ltd.*, 772 F. Supp. 2d 573, 599 (S.D.N.Y. 2011) (holding that only resignations that are "'highly unusual or suspicious'" add to an inference of scienter).  Indeed, the turnover of CFOs during the Class Period more strongly supports an inference that the Second Restatement included many unforeseen difficulties that Defendants only began to comprehend after the consolidation began.  *Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*, 551 F.3d 305, 316 (4th Cir. 2009) ("There are many possible reasons other than fraud for high personnel turnover—personality conflicts, lack of opportunities for advancement, salary and compensation disputes, to name a few.").

### 3.    Plaintiffs' Allegations of Stock Sales By Insiders Are Insufficient To Demonstrate Scienter.

Finally, Plaintiffs' allegations that three Defendants (Messrs. Falcone, Joseph, and Harrison) engaged in insider trading do not meet the PSLRA's exacting pleading requirements.  (*See* Appellants' Br. 50-53.)  Sales of company stock by insiders are utterly unremarkable, particularly during a lengthy Class Period that extends back years before the restatement costs were incurred or plausibly foreseeable.  For those sales to be probative, Plaintiffs must plead specific facts showing that they were "'unusual or suspicious.'"  *Teachers*, 477 F.3d at 184 (citing *PEC Solutions*, 418 F.3d at 390); *Cozzarelli*, 549 F.3d at 627-28.  Indeed, "[s]ince the [PSLRA], numerous courts have recognized that only

46

extraordinary trading activities will suffice." *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 897-98 (W.D.N.C. 2001). Nothing of the sort is alleged here.

Most importantly, the timing of the sales is not suspicious. All of the alleged trading took place *before* July 2006—before the Second Restatement even began and long before the costs grew dramatically. Indeed, all of Mr. Harrison's alleged trading took place years earlier, in December 2004, and Mr. Harrison was gone by 2005. (*See* JA90, 182 (Compl. ¶ 108, 248).) Plaintiffs have established no compelling inference that these sales came "*at times calculated to maximize the personal benefit from undisclosed inside information.*" *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (citation omitted). Some sales occurred within the early part of the Class Period, but only because the Class Period is so "exceedingly long"—more than three and half years—which "weaken[s] any inference that c[an] be drawn" from stock sales during that period. *Teachers*, 477 F.3d at 185.[69]

Furthermore, Messrs. Falcone and Joseph did not even control their own trades: they had non-discretionary Rule 10b5-1 trading plans, established well before the Restatements.[70] Following Rule 10b5-1's procedure defeats any charge

---

[69] *See also In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092-94 (9th Cir. 2002) (finding no suspicious inference from stock sales early in an "unusually long class period" of 15 months), *abrogated on other grounds by Tellabs*, 551 U.S. at 323-24.

[70] Mr. Falcone entered into his first 10b5-1 plan before October 1, 2004 (JA473 (Form 4 (Oct. 4, 2004))), while Mr. Joseph's plan was established before April 27,

of insider trading, *see* 17 C.F.R. § 240.10b5-l(c)(l), and supports "an inference that the sales were prescheduled and not suspicious.'" *Constellation*, 738 F. Supp. 2d at 638 (quoting *Elam v. Neidorff*, 544 F.3d 921, 928-29 (8th Cir. 2008)); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007).

The alleged trading also was consistent with the individuals' "prior trading practices," not "dramatically out of line." *Ronconi*, 253 F.3d at 435. While eight of Mr. Joseph's ten largest stock sales occurred between January and May 2006, including the highest sale in February 2006, Mr. Joseph had repeatedly sold the same number of shares in 2005 when the share price was lower and his sale proceeds were smaller. Mr. Falcone's sales occurred mostly in 2004 (seven sales) and 2005 (seven sales). He sold fewer shares in 2006 (only two sales).[71] These small-volume trades, consistent with past practices, do not raise a strong inference of scienter. *Ronconi*, 253 F.3d at 436.

Courts routinely disregard insider sales when the insiders have left the majority of their holdings exposed to market fluctuations.[72] Moreover, this Court has specifically noted that allegations about sales of stock holdings—even sales of

2005 (JA816 (Form 4 (Apr. 28, 2005))), well in advance of even the First Restatement.

[71] *See* JA182-83 (Compl. ¶ 248).

[72] *See, e.g.*, *Vantive*, 283 F.3d at 1092-93 (aggregate sales of 38% of defendants' holdings insufficient to raise strong inference of scienter); *Ronconi*, 253 F.3d at 435-36 (affirming dismissal of complaint alleging that seven of eleven defendants sold 69% of their holdings and an eighth defendant sold 98% of her holdings).

92% or 100% of the holding—are "unremarkable" if they do not "tak[e] into account the defendants' vested stock options," as Plaintiffs fail to do. *Teachers*, 477 F.3d at 185; *see also First Union*, 128 F. Supp. 2d at 898 n.28 (explaining that "actual stock shares plus exercisable stock options represents the owner's trading potential more accurately than the stock shares alone"). Ignoring stock options while alleging that Messrs. Falcone, Joseph, and Harrison sold 29%, 37%, and 78% of their holdings[73] is insufficient to show "unusual" or "suspicious" activity.

Lastly, the fact that only three of the thirteen individual Defendants allegedly engaged in insider sales during the Class Period further weakens any inference of intent. Courts routinely recognize "[t]he fact that the other defendants did not sell their shares during the relevant Class Period undermines plaintiffs' claim." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *see also First Union*, 128 F. Supp.2d at 899.

Accordingly, even in the aggregate, Plaintiffs' allegations fail to raise any "cogent" or "compelling" inference of scienter. That failure required dismissal of the Rule 10b-5 claim.

### D. Plaintiffs Have Failed To Adequately Allege Scienter As To Ms. Lundquist.

The defects of Plaintiffs' scienter theory as to all Defendants are illustrated by their allegations against Ms. Lundquist, which the District Court specifically

---

[73] *See* JA183 (Compl. ¶ 249).

and separately recognized as deficient. (JA1685.) Plaintiffs' scienter theory as to Ms. Lundquist appears to be the same as for other individual defendants: that she purportedly knew that MMA's FIN 46R accounting was incorrect but deliberately lied to investors to conceal and postpone the costs of compliance. (Appellants' Br. 18, 38.) That theory not only lacks cogency, as the PSLRA requires, it is implausible, incoherent, and inconsistent with the basic facts of Ms. Lundquist's brief stint as CFO (December 2005–July 2007).

Ms. Lundquist became CFO some eighteen months *after* Plaintiffs allege MMA decided how to account for the LIHTC Funds under FIN 46R.[74] She left the Company over six months before the January 2008 dividend reduction. Plaintiffs make no allegation that Ms. Lundquist was involved in the initial accounting treatment for FIN 46R in 2004. There is no allegation that she had a pecuniary or other motive to conceal any accounting wrongdoing committed by her predecessors, or the cost of remedying it. Indeed, there is no allegation that she could even have known how much the restatement process would cost: in particular, the "unbudgeted" expense from hiring scores of outside consultants from Navigant occurred after her departure.[75] Further, there is no allegation that

---

[74] JA90, 96 (Compl. ¶¶ 109, 129).

[75] JA1520 (8-K (Aug. 2, 2007)).

she made any statements or predictions regarding the Company's dividend payments or CAD.[76]

During her time as CFO, Ms. Lundquist endeavored to get the Company's accounting right and disclosed accounting issues as they arose. Her first act as CFO was to sign the March 10, 2006, SEC filing announcing the First Restatement and warning investors that the Company's prior financial statements "should no longer be relied upon."[77] On June 22, 2006, she signed and certified a Form 10-K containing restated and audited financial statements for the period 2001 through 2005, which PwC opined "present[ed] fairly, in all material respects, [MMA's] financial position." (JA980.) This Form 10-K and a Form 10-Q issued in August 2006 are the only SEC filings containing MMA's financial statements that Ms. Lundquist signed. On September 13, 2006, while she was still CFO, the Company announced a further restatement and again warned investors that the June 2006 financial statements "should no longer be relied upon."[78] Three months later, after hiring new outside auditors, the Company voluntarily disclosed that it "will be

---

[76] Ms. Lundquist's statements regarding CAD were historical in nature, and Plaintiffs allege no facts indicating that those statements were false when made. JA134, 138 (Compl. ¶¶ 194, 201).

[77] JA134, 821 (Compl. ¶ 194).

[78] JA153-54 (Compl. ¶ 220).

required to consolidate substantially all of the [LIHTC] funds it has interests in."[79]

Ms. Lundquist signed a further SEC filing on May 4, 2007 acknowledging the very facts that Plaintiffs now claim she intended to conceal, *i.e.*, that deficiencies in MMA's controls had "resulted in misstatements of [its] financial statements" from failure to consolidate VIEs.[80]

These facts demonstrate a sustained, good-faith commitment to get the Company's accounting right and belie any notion that Ms. Lundquist was somehow seeking to conceal accounting problems relating to FIN 46R or otherwise. Against an inference of honest conduct, Plaintiffs offer only the conclusory assertion from CW2 that Ms. Lundquist and others had determined "on March 10, 2006" or "at the time of the first restatement (by mid-2006)" that most funds needed to be consolidated. [81] This is the sole factual support for their claim that Ms. Lundquist knew that the Company's financial statements were false when she certified them in the summer of 2006.[82]

––––––––––––––––––––

[79] JA1373 (Press Release (Jan. 31, 2007)).

[80] JA1131, 1134.

[81] JA82, 176 (Compl. ¶¶ 82, 247).

[82] CW1, for example, says nothing more than that FIN 46R was a topic that Ms. Lundquist discussed at or around the time of the March 2006 restatement. (JA80-81 (Compl. ¶ 80).) There is no allegation that Ms. Lundquist had formed any conclusions regarding that accounting. CW3 says that there were disagreements with PwC over FIN 46R. (JA83-85 (Compl. ¶¶ 86-90).) CW3 does not say that those disagreements remained unresolved in June 2006 when PwC opined that

As a threshold matter, the "omissions and ambiguities" in the CW2 allegations require that those allegations be heavily discounted in the scienter analysis. *Tellabs*, 551 U.S. at 326; *see also Avaya,* 564 F.3d at 263 (recommending a threshold evaluation of CW allegations to determine whether to include them in a *Tellabs* weighing of inferences). It is not corroborated by any of the other CW allegations and is inconsistent with all the other facts in the Complaint. In particular, if Ms. Lundquist had concluded that most funds needed to be consolidated in March 2006, it would be nonsensical for her to have issued restated financials in the summer of 2006, only to announce a further restatement a few months later in September 2006. And, if Ms. Lundquist had wanted to conceal a FIN 46R problem, it would also be nonsensical for her to disclose that issue to public in 2007 and then embark on the very restatement process whose costs, Plaintiffs claim, she wanted to hide.

Even if the Court were to credit the CW2 allegation, it must not take the allegation in isolation. *Tellabs,* 551 U.S. at 326. Rather, it should examine the allegations as a whole and ask whether, "taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* As the District Court observed, even crediting CW2's allegation that Ms.

---

MMA's financial statements were fairly stated in all material respects. (JA980.) Moreover, as discussed above, it also appears that CW3 was discussing events that took place in 2004—long before Ms. Lundquist became CFO. *See supra* n.68.

Lundquist had concluded consolidation was necessary at the time the March 2006 restatement, the "more compelling inference . . . is that, at the time MuniMae issued the restated 10-Q and a 10-K in the summer of 2006, [Ms. Lundquist] (and PwC) had become comfortable with the accounting, and did not then think that more restatements would be necessary." (JA1684-85.)  In other words, the more plausible inference, taking the facts as a whole, is that whatever issues CW2 had purportedly observed were resolved to Ms. Lundquist's and PwC's satisfaction by June 2006.  *Cf. Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1069 (9th Cir. 2008) (disregarding particularized CW allegation where broader facts did not support scienter inference).

Lacking a plausible story to tell as to Ms. Lundquist, Plaintiffs resort to mischaracterizing the record.  Plaintiffs now assert that Ms. Lundquist knowingly signed the false financial statements in the summer of 2006 but then left the Company before disclosing that the accounting was incorrect.  (Appellants' Br. 38 n.10.)  But MMA did disclose the problem to investors while Ms. Lundquist was still CFO.[83]  Plaintiffs' inability to acknowledge Ms. Lundquist's willingness to remediate and disclose issues with the Company's accounting underscores their total failure to plead scienter as to her.  Indeed, their failure to assert a cogent scienter theory against Ms. Lundquist—who served as the Company's CFO during

---

[83] JA1371 (Press Release (Jan. 31, 2007)).

54

the middle of the alleged Class Period—underscores the broader infirmity of the Rule 10b-5 claim asserted against all Defendants.   This Court should therefore affirm the dismissal of those claims against Ms. Lundquist as well as against all Defendants.

### E.    Plaintiffs Have Failed To Plead Loss Causation Because They Blame The Stock Drop On The Disclosure Of Information That Was Already Public.

Plaintiffs also failed to plead a cognizable theory of loss causation.  That failure is supported by the record and is a valid alternative basis for affirming the dismissal of the Rule 10b-5 claim.  As a matter of law, Plaintiffs cannot plead that their losses were caused by the announcement of information that the market already knows.  Yet that was the case here: months before the stock drop that Plaintiffs say caused their losses, MMA had more than adequately publicized the scope of the restatement and had specifically warned that the cost of the restatement could impact dividends.

The Exchange Act requires a plaintiff to plead and prove that the defendant's act or omission "caused the loss for which the plaintiff seeks to recover damages."   15 U.S.C. § 78u-4(b)(4).  Loss causation must be pleaded "with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Teachers*, 477 F.3d at 186.

Loss causation cannot be based on the notion that *public* information caused the value of the plaintiff's shares to tumble. To allege loss causation based on a "corrective disclosure"—a revelation that caused the plaintiff's shares to lose value—the plaintiff must show "both that corrective information was revealed and that this revelation [prompted] the resulting decline in price." *Katyle*, 637 F.3d at 472 (quoting *In re Williams Sec. Litig.*, 558 F.3d 1130, 1140 (10th Cir. 2009)). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Id.* at 473.

Thus, this Court will reject a loss-causation allegation as inadequate as a matter of law if it rests on facts that "had already been disclosed in public filings." *Teachers*, 477 F.3d at 187, 188 (affirming dismissal without leave to amend based on failure to plead a cognizable theory of loss causation); *see also Katyle*, 637 F.3d at 477 (affirming dismissal in part because "[t]he market well understood the risk" and because "[t]he alleged disclosures told the market nothing factually . . . that it had not already heard"); *id.* at 478, 481 (Wynn, J., concurring in the judgment).

New spin on old facts will not do. *See, e.g.*, *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010) (holding that the release of "a negative characterization of already-public information" could not establish loss causation) (citing *Teachers*, 477 F.3d at 187-88). An allegation that the market waited

56

months to act on information it already knew is simply, "as a matter of law, unsustainable." *Id.* at 513.

Plaintiffs' theory of loss causation is "unsustainable" for precisely that reason. Plaintiffs assert that the stock price dropped in January 2008 because the cost of the restatement affected the dividend.[84] But in November 2007, MMA had explicitly warned that "[d]ue to the costs incurred by the Company in connection with the [Second Restatement]," MMA's "net cash from operations for the fiscal year 2007" might not be enough to pay dividends at the same "dividend payout ratio" that MMA had maintained to that point in the fiscal year.[85]

Moreover, MMA had warned that the cost of the Second Restatement "w[ould] be very significant" in its own right and that the Company had not budgeted for "external resources of nearly this magnitude."[86] As MMA explained, it had "over 100 [full-time employee equivalents] working on the restatement

---

[84] *See, e.g.*, JA210 (Compl. ¶ 292).

[85] JA1381 (Press Release (Nov. 2, 2007)); *see* JA1155 (8-K (Nov. 8, 2007)) ("[D]ue to the costs being incurred by the Company in connection with the restatement the sum total of all of the dividends declared so far in 2007 represent a payout ratio in excess of the Company's net cash from operations through Q3 of this year. The final payout ratio for 2007 will, of course, not be known until year end but it is possible that the dividend payout ratio for the full fiscal year 2007 may exceed 100% of the Company's net cash from operations due to the costs being incurred by the Company from the restatement. . . . We hope upon completion of the restatement and normalization of our financial reporting situation to return to a more normal cost environment and to significantly improve our payout ratio.").

[86] JA1157 (8-K (Nov. 8, 2007)).

including company employees and consultants."[87]  Thus, to the extent the investing

public was not already aware that the restatement was lengthy, time-consuming,

and costly, MMA expressly informed the public that the restatement was expensive

and would continue to be, both in absolute terms and with respect to CAD.[88]  The

January 2008 decline in the stock price could not have been based on any such

already-public information; rather, the decline was more likely related to the

dividend cut's becoming a reality and the revelation that MMA's stock would be

de-listed.  (JA1688.)

The District Court acknowledged Defendants' "valid arguments" based on

their previous warnings, but it nonetheless disregarded these public disclosures

principally because they did not cause "significant stock price declines" in

November 2007.  (JA1688-89.) [89]  That has never been the test:  already-public

information cannot be the basis for loss causation.  When the information became

---

[87] JA1157 (8-K (Nov. 8, 2007)).

[88] To the extent Plaintiffs' theory depends on the notion that the market could not react until it knew the precise dollar cost of the restatement in fiscal year 2007 (*see* Appellants' Br. 11, 47), that theory cannot possibly support loss causation, because the specific figure that Plaintiffs repeatedly cite was not disclosed until more than two months *after* the January 2008 disclosures on which Plaintiffs blame their losses.  (*See* JA1203 (8-K (Apr. 9, 2008)).)

[89] The District Court cited only one case, which did not involve loss causation. Rather, it considered whether plaintiffs could be on inquiry notice for limitations purposes without a stock drop, and held that a disclosure's lack of effect on stock price cannot be dispositive.  *See In re Merck & Co, Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 168, 171 (3d Cir. 2008), *aff'd*, *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).

public, and what happened when it did, are not relevant, and in *Teachers* and *Katyle* this Court did not need to discuss anything more than that the information was already public. *Teachers*, 477 F.3d at 187. A loss-causation allegation fails when it is based on information that the market already knew; it would be absurd to hold that a loss-causation allegation succeeds when it is based on information that the market already knew *and did not care much about*.

Plaintiffs previously contended that MMA had negated the effectiveness of its November 2007 disclosures by stating that "management plans to ask the Board to maintain the current dividend policy."[90] But in the *immediately preceding sentence*, MMA's CEO had clearly stated that "the work that is being done to restate our financial statements could affect some of what we currently expect."[91] Immediately after mentioning the "current dividend policy," he referred to "the costs being incurred by the Company in connection with the restatement" as the reason there might not be enough net cash from operations to maintain the current dividend payout ratio.[92]

Plaintiffs' theory of loss causation depends on the notion that the market failed to absorb MMA's warnings about the cost of the restatement and the possibility that it might affect the dividend, until the very day that MMA actually

---

[90] JA1687; *see also* JA1155 (8-K (Nov. 8, 2007)).

[91] JA1155 (8-K (Nov. 8, 2007)).

[92] JA1155 (8-K (Nov. 8, 2007)).

decided to reduce the dividend payments.  Because MMA had publicly warned about that possibility months earlier, Plaintiffs have failed to identify a cognizable theory of loss causation.

## III.  THE DISTRICT COURT CORRECTLY DISMISSED THE CONTROL-PERSON CLAIMS.

Plaintiffs do not dispute that to state a "control person" claim under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, they must first establish a primary violation of the securities laws.  Because Plaintiffs' other claims were correctly dismissed, their control-person claims fail as well.  *See Greenhouse*, 392 F.3d at 656 n.7.

## CONCLUSION

The judgment of the District Court should be affirmed.

Dated:  June 28, 2013

                              Respectfully submitted,

                              By: s/ Mark Holland_____
                                  Mark Holland
                                  William M. Jay
                                  Mary K. Dulka
                                  GOODWIN PROCTER LLP
                                  The New York Times Building
                                  620 Eighth Avenue
                                  New York, NY 10018
                                  (212) 813-8800

                                  Anthony Candido
                                  CLIFFORD CHANCE LLP
                                  31 West 52nd Street
                                  New York, NY 10019
                                  (212) 878-8000

                                  Stephen A. Goldberg
                                  Ward B. Coe III
                                  GALLAGHER EVELIUS
                                     & JONES LLP
                                  218 North Charles St., Suite 400
                                  Baltimore, MD  21201
                                  (410) 727-7702

                                  *Attorneys for Defendants-*
                                  *Appellees Municipal Mortgage &*
                                  *Equity, LLC, Mark K. Joseph,*
                                  *William S. Harrison, Charles M.*
                                  *Pinckney, and David Kay*

61

s/ William M. Krulak, Jr. (MH by permission)
William M. Krulak, Jr.
MILES & STOCKBRIDGE P.C.
100 Light St.
Baltimore, MD  21202
(410) 727-6464

*Attorneys for Defendants-Appellees Charles C. Baum, Richard O. Berndt, Eddie C. Brown, Robert S. Hillman, Douglas A. McGregor, Arthur S. Mehlman, and Fred N. Pratt, Jr.*

s/Charles O. Monk, II (MH by permission)
Charles O. Monk, II
Geoffrey M. Gamble
SAUL EWING LLP
500 E. Pratt St., Suite 900
Baltimore, MD  21202
(410) 332-8600

*Attorneys for Defendant-Appellee Michael L. Falcone*

s/David W.T. Daniels (MH by permission)
David W.T. Daniels
RICHARDS KIBBE & ORBE LLP
701 8th St., N.W.
Washington, DC  20001
(202) 261-2960

*Attorneys for Defendant-Appellee Melanie Lundquist*

62

## CERTIFICATE OF COMPLIANCE

The undersigned, Mark Holland, hereby certifies pursuant to Fed. R. App. P. 32(a)(7)(C) that the Brief of Defendants-Appellees complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B).  According to the word count of Microsoft Word for Windows, the word-processing system used to prepare the brief, the brief contains 13,988 words, excluding the parts of the brief exempted by Fed R. App. P. 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  June 28, 2013

Respectfully submitted,

s/ Mark Holland

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2013, I caused the foregoing Brief of Defendants-Appellees to be transmitted to the Clerk of the United States Court of Appeals for the Fourth Circuit through the CM/ECF system.  I further certify that on July 1, 2013, I caused eight true and correct paper copies of the foregoing Brief of Defendants-Appellees to be transmitted to the Clerk by FedEx overnight delivery to the following address:

Patricia S. Connor, Clerk
U.S. Court of Appeals for the Fourth Circuit
1100 East Main Street, Suite 501
Richmond, VA 23219-3517

I also certify that on June 28, 2013, pursuant to Fed. R. App. P. 25(d), I served the counsel listed on the following page, who are filing users, through the CM/ECF system.

<u>s/ Mark Holland</u>

Susan Katrina Alexander
salexander@rgrdlaw.com
Andrew S. Love
alove@rgrdlaw.com
ROBBINS GELLER RUDMAN &
DOWD, LLP
One Montgomery St., Ste 1800
San Francisco, CA 94104

David A. P. Brower
brower@browerpiven.com
BROWER PIVEN
475 Park Ave. South, 33rd Floor
New York, NY 10016
brower@browerpiven.com

Charles J. Piven
piven@browerpiven.com
Yelena Trepetin
trepetin@browerpiven.com
BROWER PIVEN
1925 Old Valley Road
Stevenson, MD 21153

Barbara A. Podell
bpodell@bm.net
BERGER & MONTAGUE, PC
1622 Locust Street
Philadelphia, PA 19103

Jonathan C. Dickey
jdickey@gibsondunn.com
GIBSON, DUNN & CRUTCHER
LLP
200 Park Ave., 47th Floor
New York, NY 10166

Jason J. Mendro
jmendro@gibsondunn.com
GIBSON, DUNN & CRUTCHER
LLP
1050 Connecticut Ave., NW, Ste 200
Washington, DC 20036

## ADDENDUM OF BRIEF OF DEFENDANTS-APPELLEES

## <u>TABLE OF CONTENTS</u>

| <u>Document Description</u> | <u>Page</u> |
|---|---|
| 15 U.S.C. § 77d............................................................................ | A1 |
| 15 U.S.C. § 77e. ......................................................................... | A4 |
| 15 U.S.C. § 77m.......................................................................... | A6 |
| 15 U.S.C. § 78u-4........................................................................ | A7 |
| 17 C.F.R. § 229.512 (effective Sept. 30, 2000 through Mar. 7, 2005)............. | A18 |
| 17 C.F.R. § 229.512 (current).......................................................... | A22 |
| 17 C.F.R. § 230.430B.................................................................... | A28 |

**15 U.S.C.**
United States Code, 2011 Edition
Title 15 - COMMERCE AND TRADE
CHAPTER 2A - SECURITIES AND TRUST INDENTURES
SUBCHAPTER I - DOMESTIC SECURITIES
Sec. 77d - Exempted transactions
From the U.S. Government Printing Office, www.gpo.gov

## §77d. Exempted transactions

The provisions of section 77e of this title shall not apply to—

(1) transactions by any person other than an issuer, underwriter, or dealer.

(2) transactions by an issuer not involving any public offering.

(3) transactions by a dealer (including an underwriter no longer acting as an underwriter in respect of the security involved in such transaction), except—

(A) transactions taking place prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter,

(B) transactions in a security as to which a registration statement has been filed taking place prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public by the issuer or by or through an underwriter after such effective date, whichever is later (excluding in the computation of such forty days any time during which a stop order issued under section 77h of this title is in effect as to the security), or such shorter period as the Commission may specify by rules and regulations or order, and

(C) transactions as to securities constituting the whole or a part of an unsold allotment to or subscription by such dealer as a participant in the distribution of such securities by the issuer or by or through an underwriter.

With respect to transactions referred to in clause (B), if securities of the issuer have not previously been sold pursuant to an earlier effective registration statement the applicable period, instead of forty days, shall be ninety days, or such shorter period as the Commission may specify by rules and regulations or order.

(4) brokers' transactions executed upon customers' orders on any exchange or in the over-the-counter market but not the solicitation of such orders.

(5) transactions involving offers or sales by an issuer solely to one or more accredited investors, if the aggregate offering price of an issue of securities offered in reliance on this paragraph does not exceed the amount allowed under section 77c(b) of this title, if there is no advertising or public solicitation in connection with the transaction by the issuer or anyone acting on the issuer's behalf, and if the issuer files such notice with the Commission as the Commission shall prescribe.

(May 27, 1933, ch. 38, title I, §4, 48 Stat. 77; June 6, 1934, ch. 404, title II, §203, 48 Stat. 906; Aug. 10, 1954, ch. 667, title I, §6, 68 Stat. 684; Pub. L. 88–467, §12, Aug. 20, 1964, 78 Stat. 580; Pub. L. 94–29, §30, June 4, 1975, 89 Stat. 169; Pub. L. 96–477, title VI, §602, Oct. 21, 1980, 94 Stat. 2294; Pub. L. 111–203, title IX, §944(a), July 21, 2010, 124 Stat. 1897.)

### AMENDMENTS

**2010**—Pars. (5), (6). Pub. L. 111–203 redesignated par. (6) as (5) and struck out former par. (5) which related to exemption for certain transactions involving offers or sales of one or more promissory notes directly secured by a first lien on a single parcel of real estate upon which is located a dwelling or other residential or commercial structure, and exemption for certain transactions between entities involving

A1

non-assignable contracts to buy or sell the foregoing securities which are to be completed within two years.

**1980**—Par. (6). Pub. L. 96–477 added par. (6).

**1975**—Par. (5). Pub. L. 94–29 added par. (5).

**1964**—Pub. L. 88–467 substituted "shall not apply to—" for "shall not apply to any of the following transactions:" in introductory text.

Par. (1). Pub. L. 88–467 reenacted existing first provision of par. (1) and struck out second and third provisions, which are incorporated in pars. (2) and (3)(A) to (C).

Par. (2). Pub. L. 88–467 redesignated existing second provision of par. (1) as (2). Former par. (2) redesignated (4).

Par. (3). Pub. L. 88–467 redesignated existing third provision of par. (1) as (3), designated the excepted transactions as cls. (A) to (C), inserted in cl. (B) "or such shorter period as the Commission may specify by rules and regulations or order" and inserted sentence relating to the applicable period to transactions referred to in clause (B).

Par. (4). Pub. L. 88–467 redesignated former par. (2) as (4) and substituted "over-the-counter market" for "open or counter market".

**1954**—Act Aug. 10, 1954, reduced from 1 year to 40 days the period during which the delivery of a prospectus is required in trading transactions as distinguished from initial distribution of the new securities.

**1934**—Act June 6, 1934, among other changes, repealed par. (3), provisions of which were replaced by section 77c(9), (10) of this title.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

### EFFECTIVE DATE OF 1975 AMENDMENT

Amendment by Pub. L. 94–29 effective June 4, 1975, see section 31(a) of Pub. L. 94–29, set out as a note under section 78b of this title.

### EFFECTIVE DATE OF 1964 AMENDMENT

Amendment by Pub. L. 88–467 effective Aug. 20, 1964, see section 13 of Pub. L. 88–467, set out as a note under section 78c of this title.

### EFFECTIVE DATE OF 1954 AMENDMENT

Amendment by act Aug. 10, 1954, effective 60 days after Aug. 10, 1954, see note under section 77b of this title.

### TRANSFER OF FUNCTIONS

For transfer of functions of Securities and Exchange Commission, with certain exceptions, to Chairman of such Commission, see Reorg. Plan No. 10 of 1950, §§1, 2, eff. May 24, 1950, 15 F.R. 3175, 64 Stat. 1265, set out under section 78d of this title.

### DISQUALIFYING FELONS AND OTHER "BAD ACTORS" FROM REGULATION D OFFERINGS

Pub. L. 111–203, title IX, §926, July 21, 2010, 124 Stat. 1851, provided that: "Not later than 1 year after the date of enactment of this Act [July 21, 2010], the Commission shall issue rules for the disqualification of offerings and sales of securities made under section 230.506 of title 17, Code of Federal Regulations, that—

"(1) are substantially similar to the provisions of section 230.262 of title 17, Code of Federal Regulations, or any successor thereto; and

"(2) disqualify any offering or sale of securities by a person that—

"(A) is subject to a final order of a State securities commission (or an agency or officer of a State performing like functions), a State authority that supervises or examines banks, savings associations, or credit unions, a State insurance commission (or an agency or officer of a State performing like functions), an appropriate Federal banking agency, or the National Credit Union Administration, that—

A2

"(i) bars the person from—

"(I) association with an entity regulated by such commission, authority, agency, or officer;

"(II) engaging in the business of securities, insurance, or banking; or

"(III) engaging in savings association or credit union activities; or

"(ii) constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct within the 10-year period ending on the date of the filing of the offer or sale; or

"(B) has been convicted of any felony or misdemeanor in connection with the purchase or sale of any security or involving the making of any false filing with the Commission."

[For definitions of terms used in section 926 of Pub. L. 111–203, set out above, see section 5301 of Title 12, Banks and Banking.]

A3

**15 U.S.C.**
United States Code, 2011 Edition
Title 15 - COMMERCE AND TRADE
CHAPTER 2A - SECURITIES AND TRUST INDENTURES
SUBCHAPTER I - DOMESTIC SECURITIES
Sec. 77e - Prohibitions relating to interstate commerce and the mails
From the U.S. Government Printing Office, www.gpo.gov

## §77e. Prohibitions relating to interstate commerce and the mails

### (a) Sale or delivery after sale of unregistered securities

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

### (b) Necessity of prospectus meeting requirements of section 77j of this title

It shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security with respect to which a registration statement has been filed under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

(2) to carry or cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of subsection (a) of section 77j of this title.

### (c) Necessity of filing registration statement

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

### (d) Security-based swaps

Notwithstanding the provisions of section 77c or 77d of this title, unless a registration statement meeting the requirements of section 77j(a) of this title is in effect as to a security-based swap, it shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell, offer to buy or purchase or sell a security-based swap to any person who is not an eligible contract participant as defined in section 1a(18) of title 7.

(May 27, 1933, ch. 38, title I, §5, 48 Stat. 77; June 6, 1934, ch. 404, title II, §204, 48 Stat. 906; Aug. 10, 1954, ch. 667, title I, §7, 68 Stat. 684; Pub. L. 111–203, title VII, §768(b), July 21, 2010, 124 Stat. 1801.)

### AMENDMENT OF SECTION

*Unless otherwise provided, amendment by subtitle B (§§761–774) of title VII of Pub. L. 111–203 effective on the later of 360 days after July 21, 2010, or, to the extent a provision of subtitle B requires a rulemaking, not less than 60 days after publication of the final rule or regulation*

A4

*implementing such provision of subtitle B, see 2010 Amendment notes and Effective Date of 2010 Amendment note below.*

### AMENDMENTS

**2010**—Subsec. (d). Pub. L. 111–203 added subsec. (d).

**1954**—Subsec. (a)(1). Act Aug. 10, 1954, struck out "or offer to buy" after "to sell".

Subsec. (b). Act Aug. 10, 1954, in par. (1) substituted "with respect to which a registration statement has been filed" for "registered" and in par. (2) omitted "to" after "to carry or" and inserted "subsection (a) of" before "section 77j of this title".

Subsec. (c). Act Aug. 10, 1954, added subsec. (c).

**1934**—Act June 6, 1934, repealed subsec. (c), the provisions of which were replaced by section 77c(a)(11) of this title.

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the later of 360 days after July 21, 2010, or, to the extent a provision of subtitle B (§§761–774) of title VII of Pub. L. 111–203 requires a rulemaking, not less than 60 days after publication of the final rule or regulation implementing such provision of subtitle B, see section 774 of Pub. L. 111–203, set out as a note under section 77b of this title.

### EFFECTIVE DATE OF 1954 AMENDMENT

Amendment by act Aug. 10, 1954, effective 60 days after Aug. 10, 1954, see note under section 77b of this title.

### INCREASED ACCESS TO FOREIGN BUSINESS INFORMATION

Pub. L. 104–290, title I, §109, Oct. 11, 1996, 110 Stat. 3426, provided that: "Not later than 1 year after the date of enactment of this Act [Oct. 11, 1996], the Commission shall adopt rules under the Securities Act of 1933 [15 U.S.C. 77a et seq.] concerning the status under the registration provisions of the Securities Act of 1933 of foreign press conferences and foreign press releases by persons engaged in the offer and sale of securities."

A5

**15 U.S.C.**
United States Code, 2011 Edition
Title 15 - COMMERCE AND TRADE
CHAPTER 2A - SECURITIES AND TRUST INDENTURES
SUBCHAPTER I - DOMESTIC SECURITIES
Sec. 77m - Limitation of actions
From the U.S. Government Printing Office, www.gpo.gov

## §77m. Limitation of actions

No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

(May 27, 1933, ch. 38, title I, §13, 48 Stat. 84; June 6, 1934, ch. 404, title II, §207, 48 Stat. 908; Pub. L. 105–353, title III, §301(a)(3), Nov. 3, 1998, 112 Stat. 3235.)

#### AMENDMENTS

**1998**—Pub. L. 105–353 substituted "77*l*(a)(2)" for "77*l*(2)" in two places and "77*l*(a)(1)" for "77*l*(1)" in two places.

**1934**—Act June 6, 1934, substituted "one year" for "two years", "three years" for "ten years", and inserted "or under section 77*l*(2) of this title more than three years after the sale".

A6

**15 U.S.C.**
United States Code, 2011 Edition
Title 15 - COMMERCE AND TRADE
CHAPTER 2B - SECURITIES EXCHANGES
Sec. 78u-4 - Private securities litigation
From the U.S. Government Printing Office, www.gpo.gov

# §78u–4. Private securities litigation

## (a) Private class actions

### (1) In general

The provisions of this subsection shall apply in each private action arising under this chapter that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.

### (2) Certification filed with complaint

#### (A) In general

Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that—

(i) states that the plaintiff has reviewed the complaint and authorized its filing;

(ii) states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

(iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

(v) identifies any other action under this chapter, filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

(vi) states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

#### (B) Nonwaiver of attorney-client privilege

The certification filed pursuant to subparagraph (A) shall not be construed to be a waiver of the attorney-client privilege.

### (3) Appointment of lead plaintiff

#### (A) Early notice to class members

##### (i) In general

Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period; and

(II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

### (ii) Multiple actions

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i).

### (iii) Additional notices may be required under Federal rules

Notice required under clause (i) shall be in addition to any notice required pursuant to the Federal Rules of Civil Procedure.

## (B) Appointment of lead plaintiff

### (i) In general

Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

### (ii) Consolidated actions

If more than one action on behalf of a class asserting substantially the same claim or claims arising under this chapter has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (i) until after the decision on the motion to consolidate is rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph.

### (iii) Rebuttable presumption

#### (I) In general

Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

#### (II) Rebuttal evidence

The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

### (iv) Discovery

For purposes of this subparagraph, discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates a reasonable basis for a finding that

A8

the presumptively most adequate plaintiff is incapable of adequately representing the class.

### (v) Selection of lead counsel

The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

### (vi) Restrictions on professional plaintiffs

Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

## (4) Recovery by plaintiffs

The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

## (5) Restrictions on settlements under seal

The terms and provisions of any settlement agreement of a class action shall not be filed under seal, except that on motion of any party to the settlement, the court may order filing under seal for those portions of a settlement agreement as to which good cause is shown for such filing under seal. For purposes of this paragraph, good cause shall exist only if publication of a term or provision of a settlement agreement would cause direct and substantial harm to any party.

## (6) Restrictions on payment of attorneys' fees and expenses

Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

## (7) Disclosure of settlement terms to class members

Any proposed or final settlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements:

### (A) Statement of plaintiff recovery

The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis.

### (B) Statement of potential outcome of case

#### (i) Agreement on amount of damages

If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement concerning the average amount of such potential damages per share.

#### (ii) Disagreement on amount of damages

If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this chapter, a statement from each settling party concerning the issue or issues on which the parties disagree.

#### (iii) Inadmissibility for certain purposes

A9

A statement made in accordance with clause (i) or (ii) concerning the amount of damages shall not be admissible in any Federal or State judicial action or administrative proceeding, other than an action or proceeding arising out of such statement.

**(C) Statement of attorneys' fees or costs sought**

If any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought. Such information shall be clearly summarized on the cover page of any notice to a party of any proposed or final settlement agreement.

**(D) Identification of lawyers' representatives**

The name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class.

**(E) Reasons for settlement**

A brief statement explaining the reasons why the parties are proposing the settlement.

**(F) Other information**

Such other information as may be required by the court.

**(8) Security for payment of costs in class actions**

In any private action arising under this chapter that is certified as a class action pursuant to the Federal Rules of Civil Procedure, the court may require an undertaking from the attorneys for the plaintiff class, the plaintiff class, or both, or from the attorneys for the defendant, the defendant, or both, in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that may be awarded under this subsection.

**(9) Attorney conflict of interest**

If a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class.

**(b) Requirements for securities fraud actions**

**(1) Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant—

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2) Required state of mind**

**(A) In general**

Except as provided in subparagraph (B), in any private action arising under this chapter

A10

in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

**(B) Exception**

In the case of an action for money damages brought against a credit rating agency or a controlling person under this chapter, it shall be sufficient, for purposes of pleading any required state of mind in relation to such action, that the complaint state with particularity facts giving rise to a strong inference that the credit rating agency knowingly or recklessly failed—

(i) to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or

(ii) to obtain reasonable verification of such factual elements (which verification may be based on a sampling technique that does not amount to an audit) from other sources that the credit rating agency considered to be competent and that were independent of the issuer and underwriter.

**(3) Motion to dismiss; stay of discovery**

**(A) Dismissal for failure to meet pleading requirements**

In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

**(B) Stay of discovery**

In any private action arising under this chapter, all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

**(C) Preservation of evidence**

**(i) In general**

During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

**(ii) Sanction for willful violation**

A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions.

**(D) Circumvention of stay of discovery**

Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph.

**(4) Loss causation**

In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.

**(c) Sanctions for abusive litigation**

A11

**(1) Mandatory review by court**

In any private action arising under this chapter, upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

**(2) Mandatory sanctions**

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

**(3) Presumption in favor of attorneys' fees and costs**

**(A) In general**

Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction—

(i) for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

(ii) for substantial failure of any complaint to comply with any requirement of Rule 11 (b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

**(B) Rebuttal evidence**

The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that—

(i) the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or

(ii) the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

**(C) Sanctions**

If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

**(d) Defendant's right to written interrogatories**

In any private action arising under this chapter in which the plaintiff may recover money damages, the court shall, when requested by a defendant, submit to the jury a written interrogatory on the issue of each such defendant's state of mind at the time the alleged violation occurred.

**(e) Limitation on damages**

**(1) In general**

Except as provided in paragraph (2), in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the

A12

mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

**(2) Exception**

In any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

**(3) "Mean trading price" defined**

For purposes of this subsection, the "mean trading price" of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period referred to in paragraph (1).

**(f) Proportionate liability**

**(1) Applicability**

Nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws.

**(2) Liability for damages**

**(A) Joint and several liability**

Any covered person against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws.

**(B) Proportionate liability**

**(i) In general**

Except as provided in subparagraph (A), a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person, as determined under paragraph (3).

**(ii) Recovery by and costs of covered person**

In any case in which a contractual relationship permits, a covered person that prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action.

**(3) Determination of responsibility**

**(A) In general**

In any private action, the court shall instruct the jury to answer special interrogatories, or if there is no jury, shall make findings, with respect to each covered person and each of the other persons claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff, including persons who have entered into settlements with the plaintiff or plaintiffs, concerning—

(i) whether such person violated the securities laws;

(ii) the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff;

A13

and
(iii) whether such person knowingly committed a violation of the securities laws.

**(B) Contents of special interrogatories or findings**

The responses to interrogatories, or findings, as appropriate, under subparagraph (A) shall specify the total amount of damages that the plaintiff is entitled to recover and the percentage of responsibility of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs.

**(C) Factors for consideration**

In determining the percentage of responsibility under this paragraph, the trier of fact shall consider—

(i) the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs; and

(ii) the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs.

**(4) Uncollectible share**

**(A) In general**

Notwithstanding paragraph (2)(B), upon [1] motion made not later than 6 months after a final judgment is entered in any private action, the court determines that all or part of the share of the judgment of the covered person is not collectible against that covered person, and is also not collectible against a covered person described in paragraph (2)(A), each covered person described in paragraph (2)(B) shall be liable for the uncollectible share as follows:

**(i) Percentage of net worth**

Each covered person shall be jointly and severally liable for the uncollectible share if the plaintiff establishes that—

(I) the plaintiff is an individual whose recoverable damages under the final judgment are equal to more than 10 percent of the net worth of the plaintiff; and

(II) the net worth of the plaintiff is equal to less than $200,000.

**(ii) Other plaintiffs**

With respect to any plaintiff not described in subclauses (I) and (II) of clause (i), each covered person shall be liable for the uncollectible share in proportion to the percentage of responsibility of that covered person, except that the total liability of a covered person under this clause may not exceed 50 percent of the proportionate share of that covered person, as determined under paragraph (3)(B).

**(iii) Net worth**

For purposes of this subparagraph, net worth shall be determined as of the date immediately preceding the date of the purchase or sale (as applicable) by the plaintiff of the security that is the subject of the action, and shall be equal to the fair market value of assets, minus liabilities, including the net value of the investments of the plaintiff in real and personal property (including personal residences).

**(B) Overall limit**

In no case shall the total payments required pursuant to subparagraph (A) exceed the amount of the uncollectible share.

**(C) Covered persons subject to contribution**

A covered person against whom judgment is not collectible shall be subject to contribution and to any continuing liability to the plaintiff on the judgment.

A14

**(5) Right of contribution**

To the extent that a covered person is required to make an additional payment pursuant to paragraph (4), that covered person may recover contribution—

(A) from the covered person originally liable to make the payment;

(B) from any covered person liable jointly and severally pursuant to paragraph (2)(A);

(C) from any covered person held proportionately liable pursuant to this paragraph who is liable to make the same payment and has paid less than his or her proportionate share of that payment; or

(D) from any other person responsible for the conduct giving rise to the payment that would have been liable to make the same payment.

**(6) Nondisclosure to jury**

The standard for allocation of damages under paragraphs (2) and (3) and the procedure for reallocation of uncollectible shares under paragraph (4) shall not be disclosed to members of the jury.

**(7) Settlement discharge**

**(A) In general**

A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action—

(i) by any person against the settling covered person; and

(ii) by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person.

**(B) Reduction**

If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of—

(i) an amount that corresponds to the percentage of responsibility of that covered person; or

(ii) the amount paid to the plaintiff by that covered person.

**(8) Contribution**

A covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages. A claim for contribution shall be determined based on the percentage of responsibility of the claimant and of each person against whom a claim for contribution is made.

**(9) Statute of limitations for contribution**

In any private action determining liability, an action for contribution shall be brought not later than 6 months after the entry of a final, nonappealable judgment in the action, except that an action for contribution brought by a covered person who was required to make an additional payment pursuant to paragraph (4) may be brought not later than 6 months after the date on which such payment was made.

**(10) Definitions**

For purposes of this subsection—

(A) a covered person "knowingly commits a violation of the securities laws"—

(i) with respect to an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, if—

A15

    (I) that covered person makes an untrue statement of a material fact, with actual knowledge that the representation is false, or omits to state a fact necessary in order to make the statement made not misleading, with actual knowledge that, as a result of the omission, one of the material representations of the covered person is false; and

    (II) persons are likely to reasonably rely on that misrepresentation or omission; and

    (ii) with respect to an action that is based on any conduct that is not described in clause (i), if that covered person engages in that conduct with actual knowledge of the facts and circumstances that make the conduct of that covered person a violation of the securities laws;

(B) reckless conduct by a covered person shall not be construed to constitute a knowing commission of a violation of the securities laws by that covered person;

(C) the term "covered person" means—

    (i) a defendant in any private action arising under this chapter; or

    (ii) a defendant in any private action arising under section 77k of this title, who is an outside director of the issuer of the securities that are the subject of the action; and

(D) the term "outside director" shall have the meaning given such term by rule or regulation of the Commission.

(June 6, 1934, ch. 404, title I, §21D, as added and amended Pub. L. 104–67, title I, §101(b), title II, §201(a), Dec. 22, 1995, 109 Stat. 743, 758; Pub. L. 105–353, title I, §101(b)(2), title III, §301(b)(13), Nov. 3, 1998, 112 Stat. 3233, 3236; Pub. L. 111–203, title IX, §933(b), July 21, 2010, 124 Stat. 1883.)

### REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this title". See References in Text note set out under section 78a of this title.

The Federal Rules of Civil Procedure, referred to in subsecs. (a)(1), (3)(A)(iii), (B)(iii)(I)(cc), (vi), (8), (b)(3)(C)(i), and (c), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

### AMENDMENTS

**2010**—Subsec. (b)(2). Pub. L. 111–203 designated existing provisions as subpar. (A), inserted heading, substituted "Except as provided in subparagraph (B), in any" for "In any", and added subpar. (B).

**1998**—Subsec. (b)(3)(D). Pub. L. 105–353, §101(b)(2), added subpar. (D).

Subsecs. (f), (g). Pub. L. 105–353, §301(b)(13)(B), redesignated subsec. (g) as (f).

Subsec. (g)(2)(B)(i). Pub. L. 105–353, §301(b)(13)(A), substituted "subparagraph (A)" for "paragraph (1)".

**1995**—Subsec. (g). Pub. L. 104–67, §201(a), added subsec. (g).

### EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective 1 day after July 21, 2010, except as otherwise provided, see section 4 of Pub. L. 111–203, set out as an Effective Date note under section 5301 of Title 12, Banks and Banking.

### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by section 101(b)(2) of Pub. L. 105–353 not to affect or apply to any action commenced before and pending on Nov. 3, 1998, see section 101(c) of Pub. L. 105–353, set out as a note under section 77p of this title.

### EFFECTIVE DATE OF 1995 AMENDMENT

Amendment by Pub. L. 104–67 not to affect or apply to any private action arising under securities laws commenced before and pending on Dec. 22, 1995, see section 202 of Pub. L. 104–67, set out as a note under section 77k of this title.

A16

## EFFECTIVE DATE

This section not to affect or apply to any private action arising under this chapter or title I of the Securities Act of 1933 (15 U.S.C. 77a et seq.), commenced before and pending on Dec. 22, 1995, see section 108 of Pub. L. 104–67, set out as an Effective Date of 1995 Amendment note under section 77*l* of this title.

## CONSTRUCTION

Nothing in section to be deemed to create or ratify any implied right of action, or to prevent Commission, by rule or regulation, from restricting or otherwise regulating private actions under this chapter, see section 203 of Pub. L. 104–67, set out as a note under section 78j–1 of this title.

---

[1] *So in original. Probably should be preceded by "if,".*

# Code of Federal Regulations

---

## Title 17 - Commodity and Securities Exchanges

---

Volume: 2
Date: 2004-04-01
Original Date: 2004-04-01
Title: Section 229.512 - (Item 512) Undertakings.
Context: Title 17 - Commodity and Securities Exchanges. CHAPTER II - SECURITIES AND EXCHANGE COMMISSION. PART 229 - STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975-REGULATION S-K. Subpart 229.500 - Registration Statement and Prospectus Provisions.

---

**§ 229.512      (Item 512) Undertakings.**

Include each of the following undertakings that is applicable to the offering being registered.

(a) *Rule 415 Offering.* [1] Include the following if the securities are registered pursuant to Rule 415 under the Securities Act (§ 230.415 of this chapter):

---

**Footnote(s):**

[1] Paragraph (a) reflects proposals made in Securities Act Release No. 6334 (Aug. 6, 1981).

---

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) (§ 230.424(b) of this chapter) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement.

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*Provided, however,* That paragraphs (a)(1)(i) and (a)(1)(ii) of this section do not apply if the registration statement is on Form S-3 (§ 239.13 of this chapter), Form S-8 (§ 239.16b of this chapter) or Form F-3 (§ 239.33 of this chapter), and the information required to be included in a post-effective amendment by those paragraphs is contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement.

A18

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) If the registrant is a foreign private issuer, to file a post-effective amendment to the registration statement to include any financial statements required by "Item 8.A. of Form 20-F (17 CFR 249.220f)" at the start of any delayed offering or throughout a continuous offering. Financial statements and information otherwise required by Section 10(a)(3) of the Act need not be furnished, *provided* that the registrant includes in the prospectus, by means of a post-effective amendment, financial statements required pursuant to this paragraph (a)(4) and other information necessary to ensure that all other information in the prospectus is at least as current as the date of those financial statements. Notwithstanding the foregoing, with respect to registration statements on Form F-3 (§ 239.33 of this chapter), a post-effective amendment need not be filed to include financial statements and information required by Section 10(a)(3) of the Act or § 210.3-19 of this chapter if such financial statements and information are contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the Form F-3.

(b) *Filings incorporating subsequent Exchange Act documents by reference.* Include the following if the registration statement incorporates by reference any Exchange Act document filed subsequent to the effective date of the registration statement:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT, FOR PURPOSES OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, EACH FILING OF THE REGISTRANT'S ANNUAL REPORT PURSUANT TO SECTION 13(A) OR SECTION 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 (AND, WHERE APPLICABLE, EACH FILING OF AN EMPLOYEE BENEFIT PLAN'S ANNUAL REPORT PURSUANT TO SECTION 15 (D) OF THE SECURITIES EXCHANGE ACT OF 1934) THAT IS INCORPORATED BY REFERENCE IN THE REGISTRATION STATEMENT SHALL BE DEEMED TO BE A NEW REGISTRATION STATEMENT RELATING TO THE SECURITIES OFFERED THEREIN, AND THE OFFERING OF SUCH SECURITIES AT THAT TIME SHALL BE DEEMED TO BE THE INITIAL BONA FIDE OFFERING THEREOF.

(c) *Warrants and rights offerings.* Include the following, with appropriate modifications to suit the particular case, if the securities to be registered are to be offered to existing security holders pursuant to warrants or rights and any securities not taken by security holders are to be reoffered to the public:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO SUPPLEMENT THE PROSPECTUS, AFTER THE EXPIRATION OF THE SUBSCRIPTION PERIOD, TO SET FORTH THE RESULTS OF THE SUBSCRIPTION OFFER, THE TRANSACTIONS BY THE UNDERWRITERS DURING THE SUBSCRIPTION PERIOD, THE AMOUNT OF UNSUBSCRIBED SECURITIES TO BE PURCHASED BY THE UNDERWRITERS, AND THE TERMS OF ANY SUBSEQUENT REOFFERING THEREOF. IF ANY PUBLIC OFFERING BY THE UNDERWRITERS IS TO BE MADE ON TERMS DIFFERING FROM THOSE SET FORTH ON THE COVER PAGE OF THE PROSPECTUS, A POST-EFFECTIVE AMENDMENT WILL BE FILED TO SET FORTH THE TERMS OF SUCH OFFERING.

(d) *Competitive bids.* Include the following, with appropriate modifications to suit the particular case, if the securities to be registered are to be offered at competitive bidding:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES (1) TO USE ITS BEST EFFORTS TO DISTRIBUTE PRIOR TO THE OPENING OF BIDS, TO PROSPECTIVE BIDDERS, UNDERWRITERS, AND DEALERS, A REASONABLE NUMBER OF COPIES OF A PROSPECTUS WHICH AT THAT TIME MEETS THE REQUIREMENTS OF SECTION 10(A) OF THE ACT, AND RELATING TO THE SECURITIES OFFERED AT COMPETITIVE BIDDING, AS CONTAINED IN THE REGISTRATION STATEMENT, TOGETHER WITH ANY SUPPLEMENTS THERETO, AND (2) TO FILE AN AMENDMENT TO THE REGISTRATION STATEMENT REFLECTING THE RESULTS OF BIDDING, THE TERMS OF THE REOFFERING AND RELATED MATTERS TO THE EXTENT REQUIRED BY THE APPLICABLE FORM, NOT LATER THAN THE FIRST USE, AUTHORIZED BY THE ISSUER AFTER THE OPENING OF BIDS, OF A PROSPECTUS RELATING TO THE SECURITIES OFFERED AT COMPETITIVE BIDDING, UNLESS NO FURTHER PUBLIC OFFERING OF SUCH SECURITIES BY THE ISSUER AND NO REOFFERING OF SUCH SECURITIES BY

A19

THE PURCHASERS IS PROPOSED TO BE MADE.

(e) *Incorporated annual and quarterly reports.* Include the following if the registration statement specifically incorporates by reference (other than by indirect incorporation by reference through a Form 10-K and Form 10-KSB (§ 249.310 of this chapter) report) in the prospectus all or any part of the annual report to security holders meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Exchange Act) §§ 240.14a-3 and 240.14c-3 of this chapter):

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO DELIVER OR CAUSE TO BE DELIVERED WITH THE PROSPECTUS, TO EACH PERSON TO WHOM THE PROSPECTUS IS SENT OR GIVEN, THE LATEST ANNUAL REPORT TO SECURITY HOLDERS THAT IS INCORPORATED BY REFERENCE IN THE PROSPECTUS AND FURNISHED PURSUANT TO AND MEETING THE REQUIREMENTS OF RULE 14A-3 OR RULE 14C-3 UNDER THE SECURITIES EXCHANGE ACT OF 1934; AND, WHERE INTERIM FINANCIAL INFORMATION REQUIRED TO BE PRESENTED BY ARTICLE 3 OF REGULATION S-X ARE NOT SET FORTH IN THE PROSPECTUS, TO DELIVER, OR CAUSE TO BE DELIVERED TO EACH PERSON TO WHOM THE PROSPECTUS IS SENT OR GIVEN, THE LATEST QUARTERLY REPORT THAT IS SPECIFICALLY INCORPORATED BY REFERENCE IN THE PROSPECTUS TO PROVIDE SUCH INTERIM FINANCIAL INFORMATION.

(f) *Equity offerings of nonreporting registrants.* Include the following if equity securities of a registrant that prior to the offering had no obligation to file reports with the Commission pursuant to section 13(a) or 15(d) of the Exchange Act are being registered for sale in an underwritten offering:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO PROVIDE TO THE UNDERWRITER AT THE CLOSING SPECIFIED IN THE UNDERWRITING AGREEMENTS CERTIFICATES IN SUCH DENOMINATIONS AND REGISTERED IN SUCH NAMES AS REQUIRED BY THE UNDERWRITER TO PERMIT PROMPT DELIVERY TO EACH PURCHASER.

(g) *Registration on Form S-4 or F-4 of securities offered for resale.* Include the following if the securities are being registered on Form S-4 or F-4 (§ 239.25, or 34 of this chapter) in connection with a transaction specified in paragraph (a) of Rule 145 (§ 230.145 of this chapter).

(1) The undersigned registrant hereby undertakes as follows: That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other Items of the applicable form.

(2) The registrant undertakes that every prospectus (i) that is filed pursuant to paragraph (h)(1) immediately preceding, or (ii) that purports to meet the requirements of section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415 (§ 230.415 of this chapter), will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(h) *Request for acceleration of effective date or filing of registration statement on Form S-8.* Include the following if acceleration is requested of the effective date of the registration statement pursuant to Rule 461 under the Securities Act (§ 230.461 of this chapter), or if the registration statement is filed on Form S-8, and:

(1) Any provision or arrangement exists whereby the registrant may indemnify a director, officer or controlling person of the registrant against liabilities arising under the Securities Act, or

(2) The underwriting agreement contains a provision whereby the registrant indemnifies the underwriter or controlling persons of the underwriter against such liabilities and a director, officer or controlling person of the registrant is such an underwriter or controlling person thereof or a member of any firm which is such an underwriter, and

A20

Appeal: 12-2496     Doc: 64     Filed: 06/28/2013     Pg: 109 of 118

(3) The benefits of such indemnification are not waived by such persons:

INSOFAR AS INDEMNIFICATION FOR LIABILITIES ARISING UNDER THE SECURITIES ACT OF 1933 MAY BE PERMITTED TO DIRECTORS, OFFICERS AND CONTROLLING PERSONS OF THE REGISTRANT PURSUANT TO THE FOREGOING PROVISIONS, OR OTHERWISE, THE REGISTRANT HAS BEEN ADVISED THAT IN THE OPINION OF THE SECURITIES AND EXCHANGE COMMISSION SUCH INDEMNIFICATION IS AGAINST PUBLIC POLICY AS EXPRESSED IN THE ACT AND IS, THEREFORE, UNENFORCEABLE. IN THE EVENT THAT A CLAIM FOR INDEMNIFICATION AGAINST SUCH LIABILITIES (OTHER THAN THE PAYMENT BY THE REGISTRANT OF EXPENSES INCURRED OR PAID BY A DIRECTOR, OFFICER OR CONTROLLING PERSON OF THE REGISTRANT IN THE SUCCESSFUL DEFENSE OF ANY ACTION, SUIT OR PROCEEDING) IS ASSERTED BY SUCH DIRECTOR, OFFICER OR CONTROLLING PERSON IN CONNECTION WITH THE SECURITIES BEING REGISTERED, THE REGISTRANT WILL, UNLESS IN THE OPINION OF ITS COUNSEL THE MATTER HAS BEEN SETTLED BY CONTROLLING PRECEDENT, SUBMIT TO A COURT OF APPROPRIATE JURISDICTION THE QUESTION WHETHER SUCH INDEMNIFICATION BY IT IS AGAINST PUBLIC POLICY AS EXPRESSED IN THE ACT AND WILL BE GOVERNED BY THE FINAL ADJUDICATION OF SUCH ISSUE.

(i) Include the following in a registration statement permitted by Rule 430A under the Securities Act of 1933 (§ 230.430A of this chapter):

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT:

(1) FOR PURPOSES OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, THE INFORMATION OMITTED FROM THE FORM OF PROSPECTUS FILED AS PART OF THIS REGISTRATION STATEMENT IN RELIANCE UPON RULE 430A AND CONTAINED IN A FORM OF PROSPECTUS FILED BY THE REGISTRANT PURSUANT TO RULE 424(B) (1) OR (4) OR 497(H) UNDER THE SECURITIES ACT SHALL BE DEEMED TO BE PART OF THIS REGISTRATION STATEMENT AS OF THE TIME IT WAS DECLARED EFFECTIVE.

(2) FOR THE PURPOSE OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, EACH POST-EFFECTIVE AMENDMENT THAT CONTAINS A FORM OF PROSPECTUS SHALL BE DEEMED TO BE A NEW REGISTRATION STATEMENT RELATING TO THE SECURITIES OFFERED THEREIN, AND THE OFFERING OF SUCH SECURITIES AT THAT TIME SHALL BE DEEMED TO BE THE INITIAL BONA FIDE OFFERING THEREOF.

(j) *Qualification of trust indentures under the Trust Indenture Act of 1939 for delayed offerings.* Include the following if the registrant intends to rely on section 305(b)(2) of the Trust Indenture Act of 1939 for determining the eligibility of the trustee under indentures for securities to be issued, offered, or sold on a delayed basis by or on behalf of the registrant:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO FILE AN APPLICATION FOR THE PURPOSE OF DETERMINING THE ELIGIBILITY OF THE TRUSTEE TO ACT UNDER SUBSECTION (A) OF SECTION 310 OF THE TRUST INDENTURE ACT ("ACT") IN ACCORDANCE WITH THE RULES AND REGULATIONS PRESCRIBED BY THE COMMISSION UNDER SECTION 305(B)(2) OF THE ACT.

[47 FR 11401, Mar. 16, 1982, as amended at 47 FR 39803, Sept. 10, 1982; 47 FR 54769, Dec. 6, 1982; 50 FR 18999, May 6, 1985; 52 FR 21260, June 5, 1987; 52 FR 21939, June 10, 1987; 52 FR 30145, Aug. 13, 1987; 55 FR 23922, June 13, 1990; 56 FR 22319, May 15, 1991; 58 FR 60306, Nov. 15, 1993; 59 FR 21649, Apr. 26, 1994; 60 FR 26615, May 17, 1995; 64 FR 53909, Oct. 5, 1999]

A21

# Code of Federal Regulations

---

## Title 17 - Commodity and Securities Exchanges

---

Volume: 2
Date: 2013-04-01
Original Date: 2013-04-01
Title: Section 229.512 - (Item 512) Undertakings.
Context: Title 17 - Commodity and Securities Exchanges. CHAPTER II - SECURITIES AND EXCHANGE COMMISSION. PART 229 - STANDARD INSTRUCTIONS FOR FILING FORMS UNDER SECURITIES ACT OF 1933, SECURITIES EXCHANGE ACT OF 1934 AND ENERGY POLICY AND CONSERVATION ACT OF 1975-REGULATION S-K. Subpart 229.500 - Registration Statement and Prospectus Provisions.

---

### § 229.512      (Item 512) Undertakings.

Include each of the following undertakings that is applicable to the offering being registered.

(a) *Rule 415 Offering.* [1] Include the following if the securities are registered pursuant to Rule 415 under the Securities Act (§ 230.415 of this chapter):

---

**Footnote(s):**

[1] Paragraph (a) reflects proposals made in Securities Act Release No. 6334 (Aug. 6, 1981).

---

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

(i) To include any prospectus required by section 10(a)(3) of the Securities Act of 1933;

(ii) To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement. Notwithstanding the foregoing, any increase or decrease in volume of securities offered (if the total dollar value of securities offered would not exceed that which was registered) and any deviation from the low or high end of the estimated maximum offering range may be reflected in the form of prospectus filed with the Commission pursuant to Rule 424(b) (§ 230.424(b) of this chapter) if, in the aggregate, the changes in volume and price represent no more than 20% change in the maximum aggregate offering price set forth in the "Calculation of Registration Fee" table in the effective registration statement.

(iii) To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

*Provided, however,* That:

(A) Paragraphs (a)(1)(i) and (a)(1)(ii) of this section do not apply if the registration statement is on Form S-8 (§ 239.16b of this chapter), and the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange

A22

Act of 1934 (15 U.S.C. 78m or 78o(d)) that are incorporated by reference in the registration statement; and

(B) Paragraphs (a)(1)(i), (a)(1)(ii) and (a)(1)(iii) of this section do not apply if the registration statement is on Form S-3 (§ 239.13 of this chapter) or Form F-3 (§ 239.33 of this chapter) and the information required to be included in a post-effective amendment by those paragraphs is contained in reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the registration statement, or is contained in a form of prospectus filed pursuant to Rule 424(b) (§ 230.424(b) of this chapter) that is part of the registration statement.

(C) *Provided further, however*, that paragraphs (a)(1)(i) and (a)(1)(ii) do not apply if the registration statement is for an offering of asset-backed securities on Form S-1 (§ 239.11 of this chapter) or Form S-3 (§ 239.13 of this chapter), and the information required to be included in a post-effective amendment is provided pursuant to Item 1100(c) of Regulation AB (§ 229.1100 (c)).

(2) That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

(4) If the registrant is a foreign private issuer, to file a post-effective amendment to the registration statement to include any financial statements required by "Item 8.A. of Form 20-F (17 CFR 249.220f)" at the start of any delayed offering or throughout a continuous offering. Financial statements and information otherwise required by Section 10(a)(3) of the Act need not be furnished, *provided* that the registrant includes in the prospectus, by means of a post-effective amendment, financial statements required pursuant to this paragraph (a)(4) and other information necessary to ensure that all other information in the prospectus is at least as current as the date of those financial statements. Notwithstanding the foregoing, with respect to registration statements on Form F-3 (§ 239.33 of this chapter), a post-effective amendment need not be filed to include financial statements and information required by Section 10(a)(3) of the Act or § 210.3-19 of this chapter if such financial statements and information are contained in periodic reports filed with or furnished to the Commission by the registrant pursuant to section 13 or section 15(d) of the Securities Exchange Act of 1934 that are incorporated by reference in the Form F-3.

(5) That, for the purpose of determining liability under the Securities Act of 1933 to any purchaser:

(i) If the registrant is relying on Rule 430B (§ 230.430B of this chapter):

(A) Each prospectus filed by the registrant pursuant to Rule 424(b)(3) (§ 230.424(b)(3) of this chapter) shall be deemed to be part of the registration statement as of the date the filed prospectus was deemed part of and included in the registration statement; and

(B) Each prospectus required to be filed pursuant to Rule 424(b)(2), (b)(5), or (b)(7) (§ 230.424 (b)(2), (b)(5), or (b)(7) of this chapter) as part of a registration statement in reliance on Rule 430B relating to an offering made pursuant to Rule 415(a)(1)(i), (vii), or (x) (§ 230.415(a)(1)(i), (vii), or (x) of this chapter) for the purpose of providing the information required by section 10(a) of the Securities Act of 1933 shall be deemed to be part of and included in the registration statement as of the earlier of the date such form of prospectus is first used after effectiveness or the date of the first contract of sale of securities in the offering described in the prospectus. As provided in Rule 430B, for liability purposes of the issuer and any person that is at that date an underwriter, such date shall be deemed to be a new effective date of the registration statement relating to the securities in the registration statement to which that prospectus relates, and the offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof. *Provided,*

A23

*however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date; or

(ii) If the registrant is subject to Rule 430C (§ 230.430C of this chapter), each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A (§ 230.430A of this chapter), shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. *Provided, however,* that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(6) That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities:

THE UNDERSIGNED REGISTRANT UNDERTAKES THAT IN A PRIMARY OFFERING OF SECURITIES OF THE UNDERSIGNED REGISTRANT PURSUANT TO THIS REGISTRATION STATEMENT, REGARDLESS OF THE UNDERWRITING METHOD USED TO SELL THE SECURITIES TO THE PURCHASER, IF THE SECURITIES ARE OFFERED OR SOLD TO SUCH PURCHASER BY MEANS OF ANY OF THE FOLLOWING COMMUNICATIONS, THE UNDERSIGNED REGISTRANT WILL BE A SELLER TO THE PURCHASER AND WILL BE CONSIDERED TO OFFER OR SELL SUCH SECURITIES TO SUCH PURCHASER:

(I) ANY PRELIMINARY PROSPECTUS OR PROSPECTUS OF THE UNDERSIGNED REGISTRANT RELATING TO THE OFFERING REQUIRED TO BE FILED PURSUANT TO RULE 424 (§ 230.424 OF THIS CHAPTER);

(II) ANY FREE WRITING PROSPECTUS RELATING TO THE OFFERING PREPARED BY OR ON BEHALF OF THE UNDERSIGNED REGISTRANT OR USED OR REFERRED TO BY THE UNDERSIGNED REGISTRANT;

(III) THE PORTION OF ANY OTHER FREE WRITING PROSPECTUS RELATING TO THE OFFERING CONTAINING MATERIAL INFORMATION ABOUT THE UNDERSIGNED REGISTRANT OR ITS SECURITIES PROVIDED BY OR ON BEHALF OF THE UNDERSIGNED REGISTRANT; AND

(IV) ANY OTHER COMMUNICATION THAT IS AN OFFER IN THE OFFERING MADE BY THE UNDERSIGNED REGISTRANT TO THE PURCHASER.

(b) *Filings incorporating subsequent Exchange Act documents by reference.* Include the following if the registration statement incorporates by reference any Exchange Act document filed subsequent to the effective date of the registration statement:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT, FOR PURPOSES OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, EACH FILING OF THE REGISTRANT'S ANNUAL REPORT PURSUANT TO SECTION 13(A) OR SECTION 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 (AND, WHERE APPLICABLE, EACH FILING OF AN EMPLOYEE BENEFIT PLAN'S ANNUAL REPORT PURSUANT TO SECTION 15 (D) OF THE SECURITIES EXCHANGE ACT OF 1934) THAT IS INCORPORATED BY REFERENCE IN THE REGISTRATION STATEMENT SHALL BE DEEMED TO BE A NEW REGISTRATION STATEMENT RELATING TO THE SECURITIES OFFERED THEREIN, AND THE OFFERING OF SUCH SECURITIES AT THAT TIME SHALL BE DEEMED TO BE THE INITIAL BONA FIDE OFFERING THEREOF.

(c) *Warrants and rights offerings.* Include the following, with appropriate modifications to suit the particular case, if the securities to be registered are to be offered to existing security holders pursuant to warrants or rights and any securities not taken by security holders are to be reoffered to the public:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO SUPPLEMENT THE PROSPECTUS, AFTER THE EXPIRATION OF THE SUBSCRIPTION PERIOD, TO SET FORTH THE RESULTS OF THE SUBSCRIPTION OFFER, THE TRANSACTIONS BY THE UNDERWRITERS DURING THE SUBSCRIPTION PERIOD, THE AMOUNT OF UNSUBSCRIBED SECURITIES TO BE PURCHASED BY THE UNDERWRITERS, AND THE TERMS OF ANY

A24

SUBSEQUENT REOFFERING THEREOF. IF ANY PUBLIC OFFERING BY THE UNDERWRITERS IS TO BE MADE ON TERMS DIFFERING FROM THOSE SET FORTH ON THE COVER PAGE OF THE PROSPECTUS, A POST-EFFECTIVE AMENDMENT WILL BE FILED TO SET FORTH THE TERMS OF SUCH OFFERING.

(d) *Competitive bids.* Include the following, with appropriate modifications to suit the particular case, if the securities to be registered are to be offered at competitive bidding:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES (1) TO USE ITS BEST EFFORTS TO DISTRIBUTE PRIOR TO THE OPENING OF BIDS, TO PROSPECTIVE BIDDERS, UNDERWRITERS, AND DEALERS, A REASONABLE NUMBER OF COPIES OF A PROSPECTUS WHICH AT THAT TIME MEETS THE REQUIREMENTS OF SECTION 10(A) OF THE ACT, AND RELATING TO THE SECURITIES OFFERED AT COMPETITIVE BIDDING, AS CONTAINED IN THE REGISTRATION STATEMENT, TOGETHER WITH ANY SUPPLEMENTS THERETO, AND (2) TO FILE AN AMENDMENT TO THE REGISTRATION STATEMENT REFLECTING THE RESULTS OF BIDDING, THE TERMS OF THE REOFFERING AND RELATED MATTERS TO THE EXTENT REQUIRED BY THE APPLICABLE FORM, NOT LATER THAN THE FIRST USE, AUTHORIZED BY THE ISSUER AFTER THE OPENING OF BIDS, OF A PROSPECTUS RELATING TO THE SECURITIES OFFERED AT COMPETITIVE BIDDING, UNLESS NO FURTHER PUBLIC OFFERING OF SUCH SECURITIES BY THE ISSUER AND NO REOFFERING OF SUCH SECURITIES BY THE PURCHASERS IS PROPOSED TO BE MADE.

(e) *Incorporated annual and quarterly reports.* Include the following if the registration statement specifically incorporates by reference (other than by indirect incorporation by reference through a Form 10-K (§ 249.310 of this chapter) report) in the prospectus all or any part of the annual report to security holders meeting the requirements of Rule 14a-3 or Rule 14c-3 under the Exchange Act (§ 240.14a-3 or § 240.14c-3 of this chapter):

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO DELIVER OR CAUSE TO BE DELIVERED WITH THE PROSPECTUS, TO EACH PERSON TO WHOM THE PROSPECTUS IS SENT OR GIVEN, THE LATEST ANNUAL REPORT TO SECURITY HOLDERS THAT IS INCORPORATED BY REFERENCE IN THE PROSPECTUS AND FURNISHED PURSUANT TO AND MEETING THE REQUIREMENTS OF RULE 14A-3 OR RULE 14C-3 UNDER THE SECURITIES EXCHANGE ACT OF 1934; AND, WHERE INTERIM FINANCIAL INFORMATION REQUIRED TO BE PRESENTED BY ARTICLE 3 OF REGULATION S-X ARE NOT SET FORTH IN THE PROSPECTUS, TO DELIVER, OR CAUSE TO BE DELIVERED TO EACH PERSON TO WHOM THE PROSPECTUS IS SENT OR GIVEN, THE LATEST QUARTERLY REPORT THAT IS SPECIFICALLY INCORPORATED BY REFERENCE IN THE PROSPECTUS TO PROVIDE SUCH INTERIM FINANCIAL INFORMATION.

(f) *Equity offerings of nonreporting registrants.* Include the following if equity securities of a registrant that prior to the offering had no obligation to file reports with the Commission pursuant to section 13(a) or 15(d) of the Exchange Act are being registered for sale in an underwritten offering:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO PROVIDE TO THE UNDERWRITER AT THE CLOSING SPECIFIED IN THE UNDERWRITING AGREEMENTS CERTIFICATES IN SUCH DENOMINATIONS AND REGISTERED IN SUCH NAMES AS REQUIRED BY THE UNDERWRITER TO PERMIT PROMPT DELIVERY TO EACH PURCHASER.

(g) *Registration on Form S-4 or F-4 of securities offered for resale.* Include the following if the securities are being registered on Form S-4 or F-4 (§ 239.25, or 34 of this chapter) in connection with a transaction specified in paragraph (a) of Rule 145 (§ 230.145 of this chapter).

(1) The undersigned registrant hereby undertakes as follows: That prior to any public reoffering of the securities registered hereunder through use of a prospectus which is a part of this registration statement, by any person or party who is deemed to be an underwriter within the meaning of Rule 145(c), the issuer undertakes that such reoffering prospectus will contain the information called for by the applicable registration form with respect to reofferings by persons who may be deemed underwriters, in addition to the information called for by the other Items of the applicable form.

(2) The registrant undertakes that every prospectus (i) that is filed pursuant to paragraph (h)(1) immediately preceding, or (ii) that purports to meet the requirements of section 10(a)(3) of the Act and is used in connection with an offering of securities subject to Rule 415 (§ 230.415 of this chapter), will be filed as a part of an amendment to the registration statement and will not be used until such amendment is effective, and that, for purposes of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new

A25

registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(h) *Request for acceleration of effective date or filing of registration statement becoming effective upon filing.* Include the following if acceleration is requested of the effective date of the registration statement pursuant to Rule 461 under the Securities Act (§ 230.461 of this chapter), if a Form S-3 or Form F-3 will become effective upon filing with the Commission pursuant to Rule 462 (e) or (f) under the Securities Act (§ 230.462 (e) or (f) of this chapter), or if the registration statement is filed on Form S-8, and:

(1) Any provision or arrangement exists whereby the registrant may indemnify a director, officer or controlling person of the registrant against liabilities arising under the Securities Act, or

(2) The underwriting agreement contains a provision whereby the registrant indemnifies the underwriter or controlling persons of the underwriter against such liabilities and a director, officer or controlling person of the registrant is such an underwriter or controlling person thereof or a member of any firm which is such an underwriter, and

(3) The benefits of such indemnification are not waived by such persons:

INSOFAR AS INDEMNIFICATION FOR LIABILITIES ARISING UNDER THE SECURITIES ACT OF 1933 MAY BE PERMITTED TO DIRECTORS, OFFICERS AND CONTROLLING PERSONS OF THE REGISTRANT PURSUANT TO THE FOREGOING PROVISIONS, OR OTHERWISE, THE REGISTRANT HAS BEEN ADVISED THAT IN THE OPINION OF THE SECURITIES AND EXCHANGE COMMISSION SUCH INDEMNIFICATION IS AGAINST PUBLIC POLICY AS EXPRESSED IN THE ACT AND IS, THEREFORE, UNENFORCEABLE. IN THE EVENT THAT A CLAIM FOR INDEMNIFICATION AGAINST SUCH LIABILITIES (OTHER THAN THE PAYMENT BY THE REGISTRANT OF EXPENSES INCURRED OR PAID BY A DIRECTOR, OFFICER OR CONTROLLING PERSON OF THE REGISTRANT IN THE SUCCESSFUL DEFENSE OF ANY ACTION, SUIT OR PROCEEDING) IS ASSERTED BY SUCH DIRECTOR, OFFICER OR CONTROLLING PERSON IN CONNECTION WITH THE SECURITIES BEING REGISTERED, THE REGISTRANT WILL, UNLESS IN THE OPINION OF ITS COUNSEL THE MATTER HAS BEEN SETTLED BY CONTROLLING PRECEDENT, SUBMIT TO A COURT OF APPROPRIATE JURISDICTION THE QUESTION WHETHER SUCH INDEMNIFICATION BY IT IS AGAINST PUBLIC POLICY AS EXPRESSED IN THE ACT AND WILL BE GOVERNED BY THE FINAL ADJUDICATION OF SUCH ISSUE.

(i) Include the following in a registration statement permitted by Rule 430A under the Securities Act of 1933 (§ 230.430A of this chapter):

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT:

(1) FOR PURPOSES OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, THE INFORMATION OMITTED FROM THE FORM OF PROSPECTUS FILED AS PART OF THIS REGISTRATION STATEMENT IN RELIANCE UPON RULE 430A AND CONTAINED IN A FORM OF PROSPECTUS FILED BY THE REGISTRANT PURSUANT TO RULE 424(B) (1) OR (4) OR 497(H) UNDER THE SECURITIES ACT SHALL BE DEEMED TO BE PART OF THIS REGISTRATION STATEMENT AS OF THE TIME IT WAS DECLARED EFFECTIVE.

(2) FOR THE PURPOSE OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, EACH POST-EFFECTIVE AMENDMENT THAT CONTAINS A FORM OF PROSPECTUS SHALL BE DEEMED TO BE A NEW REGISTRATION STATEMENT RELATING TO THE SECURITIES OFFERED THEREIN, AND THE OFFERING OF SUCH SECURITIES AT THAT TIME SHALL BE DEEMED TO BE THE INITIAL BONA FIDE OFFERING THEREOF.

(j) *Qualification of trust indentures under the Trust Indenture Act of 1939 for delayed offerings.* Include the following if the registrant intends to rely on section 305(b)(2) of the Trust Indenture Act of 1939 for determining the eligibility of the trustee under indentures for securities to be issued, offered, or sold on a delayed basis by or on behalf of the registrant:

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO FILE AN APPLICATION FOR THE PURPOSE OF DETERMINING THE ELIGIBILITY OF THE TRUSTEE TO ACT UNDER SUBSECTION (A) OF SECTION 310 OF THE TRUST INDENTURE ACT ("ACT") IN ACCORDANCE WITH THE RULES AND REGULATIONS PRESCRIBED BY THE COMMISSION UNDER SECTION 305(B)(2) OF THE ACT.

(k) *Filings regarding asset-backed securities incorporating by reference subsequent Exchange Act documents by third parties.* Include the following if the registration statement incorporates by reference any Exchange Act document filed subsequent to the effective date of the registration statement pursuant to Item 1100(c) of Regulation AB (§ 229.1100(c)):

A26

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT, FOR PURPOSES OF DETERMINING ANY LIABILITY UNDER THE SECURITIES ACT OF 1933, EACH FILING OF THE ANNUAL REPORT PURSUANT TO SECTION 13(A) OR SECTION 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934 OF A THIRD PARTY THAT IS INCORPORATED BY REFERENCE IN THE REGISTRATION STATEMENT IN ACCORDANCE WITH ITEM 1100(C)(1) OF REGULATION AB (17 CFR 229.1100(C)(1)) SHALL BE DEEMED TO BE A NEW REGISTRATION STATEMENT RELATING TO THE SECURITIES OFFERED THEREIN, AND THE OFFERING OF SUCH SECURITIES AT THAT TIME SHALL BE DEEMED TO BE THE INITIAL BONA FIDE OFFERING THEREOF.

(I) *Filings regarding asset-backed securities that provide certain information through an Internet Web site.* Include the following if the registration statement is to provide information required by Item 1105 of Regulation AB (§ 229.1105) through an Internet Web site in accordance with Rule 312 of Regulation S-T (§ 232.312 of this chapter):

THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES THAT, EXCEPT AS OTHERWISE PROVIDED BY ITEM 1105 OF REGULATION AB (17 CFR 229.1105), INFORMATION PROVIDED IN RESPONSE TO THAT ITEM PURSUANT TO RULE 312 OF REGULATION S-T (17 CFR 232.312) THROUGH THE SPECIFIED INTERNET ADDRESS IN THE PROSPECTUS IS DEEMED TO BE A PART OF THE PROSPECTUS INCLUDED IN THE REGISTRATION STATEMENT. IN ADDITION, THE UNDERSIGNED REGISTRANT HEREBY UNDERTAKES TO PROVIDE TO ANY PERSON WITHOUT CHARGE, UPON REQUEST, A COPY OF THE INFORMATION PROVIDED IN RESPONSE TO ITEM 1105 OF REGULATION AB PURSUANT TO RULE 312 OF REGULATION S-T THROUGH THE SPECIFIED INTERNET ADDRESS AS OF THE DATE OF THE PROSPECTUS INCLUDED IN THE REGISTRATION STATEMENT IF A SUBSEQUENT UPDATE OR CHANGE IS MADE TO THE INFORMATION.

[47 FR 11401, Mar. 16, 1982]

**Editorial Note:** For **Federal Register** citations affecting § 229.512, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.fdsys.gov*.

# Code of Federal Regulations

---

## Title 17 - Commodity and Securities Exchanges

---

Volume: 2
Date: 2013-04-01
Original Date: 2013-04-01
Title: Section 230.430B - Prospectus in a registration statement after effective date.
Context: Title 17 - Commodity and Securities Exchanges. CHAPTER II - SECURITIES AND EXCHANGE COMMISSION. PART 230 - GENERAL RULES AND REGULATIONS, SECURITIES ACT OF 1933. - Form and Content of Prospectuses.

---

### § 230.430B    Prospectus in a registration statement after effective date.

(a) A form of prospectus filed as part of a registration statement for offerings pursuant to Rule 415(a)(1)(vii) or (a)(1)(x) (§ 230.415(a)(1)(vii) or (a)(1)(x)) may omit from the information required by the form to be in the prospectus information that is unknown or not reasonably available to the issuer pursuant to Rule 409 (§ 230.409). In addition, a form of prospectus filed as part of an automatic shelf registration statement for offerings pursuant to Rule 415(a) (§ 230.415(a)), other than Rule 415(a)(1)(vii) or (viii), also may omit information as to whether the offering is a primary offering or an offering on behalf of persons other than the issuer, or a combination thereof, the plan of distribution for the securities, a description of the securities registered other than an identification of the name or class of such securities, and the identification of other issuers. Each such form of prospectus shall be deemed to have been filed as part of the registration statement for the purpose of section 7 of the Act.

(b) A form of prospectus filed as part of a registration statement for offerings pursuant to Rule 415(a)(1)(i) by an issuer eligible to use Form S-3 or Form F-3 (§ 239.13 or § 239.33 of this chapter) for primary offerings pursuant to General Instruction I.B.1 of such forms, may omit the information specified in paragraph (a) of this section, and may also omit the identities of selling security holders and amounts of securities to be registered on their behalf if:

(1) The registration statement is an automatic shelf registration statement as defined in Rule 405 (§ 230.405); or

(2) All of the following conditions are satisfied:

(i) The initial offering transaction of the securities (or securities convertible into such securities) the resale of which are being registered on behalf of each of the selling security holders, was completed;

(ii) The securities (or securities convertible into such securities) were issued and outstanding prior to the original date of filing the registration statement covering the resale of the securities;

(iii) The registration statement refers to any unnamed selling security holders in a generic manner by identifying the initial offering transaction in which the securities were sold; and

(iv) The issuer is not and during the past three years neither the issuer nor any of its predecessors was:

(A) A blank check company as defined in Rule 419(a)(2) (§ 230.419(a)(2));

(B) A shell company, other than a business combination related shell company, each as defined in Rule 405; or

(C) An issuer in an offering of penny stock as defined in Rule 3a51-1 of the Securities Exchange

A28

Act of 1934 (§ 240.3a51-1 of this chapter).

(c) A form of prospectus that is part of a registration statement that omits information in reliance upon paragraph (a) or (b) of this section meets the requirements of section 10 of the Act for the purpose of section 5(b)(1) thereof. This provision shall not limit the information required to be contained in a form of prospectus in order to meet the requirements of section 10(a) of the Act for the purposes of section 5(b)(2) thereof or exception (a) of section 2(a)(10) thereof.

(d) Information omitted from a form of prospectus that is part of an effective registration statement in reliance on paragraph (a) or (b) of this section may be included subsequently in the prospectus that is part of a registration statement by:

(1) A post-effective amendment to the registration statement;

(2) A prospectus filed pursuant to Rule 424(b) (§ 230.424(b)); or

(3) If the applicable form permits, including the information in the issuer's periodic or current reports filed pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m or 78o(d)) that are incorporated or deemed incorporated by reference into the prospectus that is part of the registration statement in accordance with applicable requirements, subject to the provisions of paragraph (h) of this section.

(e) Information omitted from a form of prospectus that is part of an effective registration statement in reliance on paragraph (a) or (b) of this section and contained in a form of prospectus required to be filed with the Commission pursuant to Rule 424(b), other than as provided in paragraph (f) of this section, shall be deemed part of and included in the registration statement as of the date such form of filed prospectus is first used after effectiveness.

(f)(1) Information omitted from a form of prospectus that is part of an effective registration statement in reliance on paragraph (a) or (b) of this section and is contained in a form of prospectus required to be filed with the Commission pursuant to Rule 424(b)(2), (b)(5), or (b)(7), shall be deemed to be part of and included in the registration statement on the earlier of the date such subsequent form of prospectus is first used or the date and time of the first contract of sale of securities in the offering to which such subsequent form of prospectus relates.

(2) The date on which a form of prospectus is deemed to be part of and included in the registration statement pursuant to paragraph (f)(1) of this section shall be deemed, for purposes of liability under section 11 of the Act of the issuer and any underwriter at the time only, to be a new effective date of the part of such registration statement relating to the securities to which such form of prospectus relates, such part of the registration statement consisting of all information included in the registration statement and any prospectus relating to the offering of such securities (including information relating to the offering in a prospectus already included in the registration statement) as of such date and all information relating to the offering included in reports and materials incorporated by reference into such registration statement and prospectus as of such date, and in each case not modified or superseded pursuant to Rule 412 (§ 230.412). The offering of such securities at that time shall be deemed to be the initial *bona fide* offering thereof.

(3) If a registration statement is amended to include or is deemed to include, through incorporation by reference or otherwise, except as otherwise provided in Rule 436 (§ 230.436), a report or opinion of any person made on such person's authority as an expert whose consent would be required under section 7 of the Act because of being named as having prepared or certified part of the registration statement, then for purposes of this section and for liability purposes under section 11 of the Act, the part of the registration statement for which liability against such person is asserted shall be considered as having become effective with respect to such person as of the time the report or opinion is deemed to be part of the registration statement and a consent required pursuant to section 7 of the Act has been provided as contemplated by section 11 of the Act.

(4) Except for an effective date resulting from the filing of a form of prospectus filed for purposes

A29

Appeal: 12-2496    Doc: 64    Filed: 06/28/2013    Pg: 118 of 118

of including information required by section 10(a)(3) of the Act or pursuant to Item 512(a)(1)(ii) of Regulation S-K (§ 229.512(a)(1)(ii) of this chapter), the date a form of prospectus is deemed part of and included in the registration statement pursuant to this paragraph shall not be an effective date established pursuant to paragraph (f)(2) of this section as to:

(i) Any director (or person acting in such capacity) of the issuer;

(ii) Any person signing any report or document incorporated by reference into the registration statement, except for such a report or document incorporated by reference for purposes of including information required by section 10(a)(3) of the Act or pursuant to Item 512(a)(1)(ii) of Regulation S-K (such person except for such reports being deemed not to be a person who signed the registration statement within the meaning of section 11(a) of the Act).

(5) The date a form of prospectus is deemed part of and included in the registration statement pursuant to paragraph (f)(2) of this section shall not be an effective date established pursuant to paragraph (f)(2) of this section as to:

(i) Any accountant with respect to financial statements or other financial information contained in the registration statement as of a prior effective date and for which the accountant previously provided a consent to be named as required by section 7 of the Act, unless the form of prospectus contains new audited financial statements or other financial information as to which the accountant is an expert and for which a new consent is required pursuant to section 7 of the Act or Rule 436; and

(ii) Any other person whose report or opinion as an expert or counsel has, with their consent, previously been included in the registration statement as of a prior effective date, unless the form of prospectus contains a new report or opinion for which a new consent is required pursuant to section 7 of the Act or Rule 436.

(g) Notwithstanding paragraph (e) or (f) of this section or paragraph (a) of Rule 412, no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement after the effective date of such registration statement or portion thereof in respect of an offering determined pursuant to this section will, as to a purchaser with a time of contract of sale prior to such effective date, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such effective date.

(h) Where a form of prospectus filed pursuant to Rule 424(b) relating to an offering does not include disclosure of omitted information regarding the terms of the offering, the securities, or the plan of distribution, or selling security holders for the securities that are the subject of the form of prospectus, because such omitted information has been included in periodic or current reports filed pursuant to section 13 or 15(d) of the Securities Exchange Act of 1934 incorporated or deemed incorporated by reference into the prospectus, the issuer shall file a form of prospectus identifying the periodic or current reports that are incorporated or deemed incorporated by reference into the prospectus that is part of the registration statement that contain such omitted information. Such form of prospectus shall be required to be filed, depending on the nature of the incorporated information, pursuant to Rule 424(b)(2), (b)(5), or (b)(7).

(i) Issuers relying on this section shall furnish the undertakings required by Item 512(a) of Regulation S-K.

Note to Rule 430B:
The provisions of paragraph (b) of Rule 401 (§ 230.401(b)) shall apply to any prospectus filed for purposes of including information required by section 10 (a)(3) of the Act.

[70 FR 44813, Aug. 3, 2005, as amended at 73 FR 969, Jan. 4, 2008]

A30